THE MECHANICS' BANK, plaintiff in error, *vs.* STEPHEN D. HEARD, defendant in error.

|     |     |
|-----|-----|
| 37  | 401 |
| 96  | 10  |
| 37  | 401 |
| 107 | 599 |
| 37  | 401 |
| 111 | 768 |

A corporation made by the General Assembly of this State, cannot terminate its existence by a voluntary surrender of its charter; the surrender must be accepted by the General Assembly.

Under our Code, a corporation may, by a voluntary surrender of its franchises, terminate its existence.

WALKER, J., dissenting.

Assumpsit.  Surrender of charter.  Tried by Judge AUGUSTUS REESE.  Richmond Superior Court.  June Term, 1867.

Heard, (on the 8th September, 1866,) sued said Bank for $11,677.00, besides interest due on certain of its bills, which he owned, and which the Bank had refused to. pay.  The return of the sheriff was, "personally served a copy of the within, upon the defendant, this the 12th day of September, 1866.                JOHN D. SMITH, Sheriff R. Co."

At June Term, 1867, this return was amended so as to read thus:  "Personally served a copy of the within upon Thomas S. Metcalf, President of the Mechanics' Bank, this 12th day of September, 1866.

JOHN D. SMITH, Sheriff R. Co."

Thereupon, Metcalf tendered a traverse, averring that on said day of service, he was not, and for a long time before that day, had not been President of said Bank, nor held any office therein; that he was elected President of the Bank, on the 2d day of January, 1865, for that calendar year, and not since; that on the 20th day of February, 1866, at a meeting of the stockholders of the Bank, duly summoned in terms of the charter, by an unanimous vote of said Directors, the charter of the Bank was surrendered to the State, and notice of such surrender was, by order of said meeting, forwarded to the Governor of Georgia, and by him received, and *ergo* the Bank ceased to exist; he ceased to be its President, and *ergo* the said service was void.

And Metcalf's counsel moved that said traverse be tried by a special jury, as a collateral issue.

27

The Court refused so to submit the traverse, stating that he would permit the questions involved in said traverse to be plead along with other pleas, and required the defendant to plead if the Bank had any other pleas.

Then WM. T. GOULD, as assignee of the Bank, plead that plaintiff should not have his action, etc., because before this action was commenced, to-wit: on the 20th day of February, 1866, said Bank had ceased to exist as a corporation by the surrender of its charter, as aforesaid, and because, before that, to-wit: on the 20th day of January, 1866, the Bank had assigned to him, for the benefit of all its creditors, all its property, and notice of such assignment was given in the "Constitutionalist," a public gazette, in Augusta, in said county, and after which surrender no corporate act was done by the Bank, nor any official act performed by any of its officers, and he prayed to go to the country.

And JOSEPH E. BROWN, a counsel for divers stockholders of the Bank, to-wit: Metcalf, Sibley, Baker and Bishop, plead the surrender of the charter and vacation of the officers of the Bank as aforesaid, with a conclusion that therefore the service was void.

It was admitted that Metcalf was the last President of the Bank, and that under the by-laws of the Bank its officers held their offices until others were elected.

Plaintiffs' counsel demurred to Gould's plea. The Court sustained the demurrer upon the ground that such surrender, till accepted by the General Assembly, worked no dissolution of the Bank.

BROWN then withdrew the plea filed by him, as last aforesaid, and offered to file for William H. Hibler, one of the stockholders of the Bank, a plea averring "that no judgment of this Court can be rendered, in this case, against him, as a stockholder of said Bank, by virtue of any publication which may have been made, and notice given, under section 3283 of the Code of Georgia, nor can any execution issue against him, or any other person, as a stockholder, by virtue of any judgment rendered under any notice given under the provisions of said section."

The Mechanics' Bank *vs.* Heard.

The Court refused to allow this plea, ruling that Hibler could not defend for himself, though any stockholder might defend for the Bank.

Then BROWN, as counsel for Hibler, filed another plea, averring that the charter of the Bank was a contract between the State and the stockholders and bill-holders of the Bank, by which the State bound itself that the Bank should exercise its corporate rights without interruption ; in consideration of which promise the Bank undertook to redeem its bills with specie, on demand, and the stockholders, upon that consideration and not otherwise, agreed to be personally liable for such redemption in proportion to their stock; that plaintiff accepted the bills of the Bank with full notice of these facts; that, while the Bank was performing all its duties, the General Assembly called a convention of the people of Georgia, which convention passed an ordinance of secession from the Union, and aided in bringing on a war, which caused a blockade of the ports of Georgia, destroyed commerce, etc., so as to force a suspension of specie payment by the Bank, and that the General Assembly had declared the charters of Banks subject to forfeiture for such suspensions. Further, that during the existence of said law, " the stay-law" was passed, and was kept in force by re-enactments, and thereby kept the Bank from collecting its assets, which were greatly in excess of its liabilities, and thereby forced the Bank to suspend. Further, during such suspension, the State, by another act, compelled the Bank to receive, on deposit and in payment of its gold debts, Confederate States treasury notes and Georgia treasury notes ; that they did receive such currency to the amount of $1,500,000 00 at par, in payment of such debts, when said currency was worth only five cents in the dollar in specie. And further, that plaintiff, at and before the war commenced, owed the Bank $15,000 00 in gold, which he refused to pay (taking advantage of said "stay law") until the currency had depreciated as aforesaid, and then offered, with it, to pay his said debt; which, under said act, the Bank was compelled to receive in payment, and did receive it, under compulsion, which was only in law a payment of the gold value of the

said currency. He further plead "set off in the sum of $13,000 00 on said debt due and unpaid," and prayed judgment against plaintiff for the difference, etc.

For further plea, he averred that the State, on the 1st day of January, 1863, under penalty of forfeiture of its charter, compelled the Bank to lend the State $500,000 00 in its bills, and to take therefor $500,000 00 of the notes and bonds of the State, and afterwards, by convention, repudiated the notes and bonds. And further, that plaintiff received these bills sued on from the Bank in July, 1863, and that this is therefore a contract falling within the scaling ordinance of the convention of 1865, and that when plaintiff took the bills they were worth only ten cents in the dollar, and it was inequitable he should recover the face of his notes.

Plaintiff's attorneys moved to strike all of this last plea except that relating to the set-off and scaling the demand. This motion was sustained by the Court.

The case then went to the jury. Plaintiff submitted his bills to the jury as evidence and closed.

The counsel for Hibler then introduced as witnesses the plaintiff and John A. North, late teller of the Bank.

HEARD testified that when the war began, he owed the Bank nothing; his firm, Heard & Simpson, did owe a considerable amount, (he did not know how much,) he could not say it was less than $20,000 or $25,000, or that it was so much. The firm kept an account with the Bank, checked on their deposits and discounts and had monthly settlements; they owed the Bank sometimes more and sometimes less, till the latter part of 1863 or first of 1864, when they were notified by the Bank to close their account, and they paid off all they owed in Confederate notes. He, at that time, held none of these notes sued on; he took some of them in payment of debts and bought some of them since the settlement. Said firm was dissolved after the settlement, and he continued business in his own name; and he did not recollect that he owed the Bank anything after the settlement. After Confederate money became current, all payments and discounts were made in it. He got none of the bills from the Bank,

but did not recollect from whom he got them.   While his firm was dealing with the Bank, they had collaterals lodged there, which were given up on the settlement.

NORTH testified that Heard & Simpson owed the Bank $30,000 00 when the war began, and were endorsers for $25,-000 00 more; they did not settle with the Bank till the latter part of 1863; but, without reference to the books of the Bank, he could not say what Heard & Simpson owed the Bank at any particular time, after the war began.   The account was closed and settled in full in the latter part of 1863.

The Court charged the jury that no set-off could be allowed unless some definite sum was shown to be due from plaintiff to defendant; but that in this case there had been monthly settlements, but did not show how much remained due and that "there was nothing proved in this case that entitles the defendant to either a legal or equitable set-off, and that the plaintiff was entitled to a verdict for the amount of the notes sued on, with interest from the commencement of the suit."   The jury found for plaintiff accordingly.

There was no motion for a new trial.

GOULD, as assignee in person, and Hibler, by Brown as his counsel, assigned as error—

1st. The refusal to allow Metcalf's traverse of the return to be tried by a special jury.

2d. The holding that the surrender of the charter was invalid till accepted by the General Assembly, and that the officers of the Bank were not discharged from their offices by said assignment and surrender.

3d. The ruling out Hibler's pleas, except as to set-off and the scaling of the demand.

4th. The charge to the jury that the evidence showed that there had been monthly settlements, but did not show how much remained due.

5th. The charge to the jury that there was nothing proved in this case that entitles the defendant to either a legal or equitable set-off.

W. T. GOULD, JOSEPH E. BROWN and JACKSON LAWTON, and BASSENGER, for the Bank, made the following points:

Acceptance by the Legislature of the surrender of a corporation is not necessary to give effect to the surrender.

It was a rule of the English Common Law, that the surrender of a charter, to be effectual, must be accepted and enrolled. That rule was never applicable, and therefore never of force in Georgia.

The first inquiry is necessarily into the reason of the rule.

"For a number of persons to be incorporated and subsist as a body politic," is a franchise. And this species of franchise is an "incorporeal hereditament;" i. e., a sort of property. 2 Bla. Com., 37.

The same writer, in his chapter on "Title by Alienation," referring to the evidences of the transfer of property, or "common assurances" of the kingdom, mentions that by "matter of record;" which, he says, is "an assurance transacted only in the King's Public Courts of Record." 2 Bla. Com., 294.

And "no freehold may be given to the King, or derived from him but by matter of record;" he mentions, as subjects of these grants, which were thus "matter of record," "lands, honours, liberties, and *franchises.*" 2 Bla. Com. 344-6.

It was necessary that these grants should be enrolled in Chancery.

Now, as a *grant* was an alienation *by,* on the other hand, a surrender of the thing granted was an alienation to the King. But as the King could not grant, so he could not receive any such thing, but "by matter of record." 2 Kyd on Corp., 165. Grant on Corp., M. P., 39. Bull N. P. 226-7.

It appears, then, that the rule in question was a thoroughly technical one, founded on special reasons and growing out of the peculiar mode of conveyancing prescribed by the Common Law in transactions between King and subject. And it applied only to that one class of corporations, viz: those created *by charter from the King.* There were no corporations by Act of Parliament, when those writers published their works. 1 Bla. Com., 473. 1 Kyd Corp., 61.

They are invariably distinguished from each other as "char-

tered corporations," and "parliamentary" or "statutory corporations." Grant Corp., 6, 7, 9, 306-8. Wilcock Mun. Corp., M. P., 25, 26, 331—2, etc.

The rules of the Common Law as to the dissolution of parliamentary corporations must have become the law of our statutory corporations.

For a reason already stated, the earlier English reports and writers make no allusion to this subject. But recent writers announce it as indisputable law that a parliamentary corporation cannot surrender. Grant Corp., 45, 46, 307, 308. Wilcock Mun. Corp., 332.

See the language of Lord Eldon in 1 Mylue & Keen, 161–2, cited in Grant Corp., 289, 290, to show the nature of the contract created by a parliamentary corporation.

Grant lays it down as the law in England that a parliamentary corporation cannot be deprived of its being or its privileges by a *quo warranto.* Grant Corp., 307, 308.

And that even when the passing of the constituting statute had been obtained by a fraud upon the Parliament, the Court of Chancery could not relieve a corporator from his obligations under it, because it could not annul a law of the land. Grant Corp., 292, who cites 11 Sim., 328. 1 Eng. Railw. Cases, 640.·

But though the creating act could not cease to be law save by a repealing act, the corporation was free to abandon its privileges. 3 Man. Grang. & Scott, 54 Eng. Com. L. Rep., 936–7.

This was the law of Georgia until the Code went into operation, which, in section 1640, for the first time announces that our statutory corporations may surrender.

The Legislature cannot have intended by "surrender" that technical surrender which was peculiar to the English chartered corporations. See also Code, sections 1442, 1443, 1444.

An assignment is equivalent to a surrender.

A corporation was dissolved by the death of all its members. A corporation, which failed to elect its officers at the appointed time, was by that failure dissolved. 1 Bla. Com., 485. A corporation, consisting of several integral parts, was

entirely dissolved by the loss of one of those parts, though all the others remained complete.   1 Bla. Com., 485, notes. Grant Corp., 302–3.   2 Kyd Corp., 448–9.   3 Burr. 1866. 3 Term R., 199.   3 East., 213.   4 East., 17.   1 Dyer. 100 a. 3 Rep., 75.   2 Kyd, 467.   Grant Corp., 306.   2 Kent Com., 308–9.   Ang. & Ames Corp. 654.

It has been intimated that if the corporation can restore itself, its existence is only suspended, not extinguished.   But this has not met with approbation, and is not the doctrine of the English Courts.   2 Kyd, 448–465.

A corporation in Georgia, which makes an assignment under section 1442 of the Code, is in this situation.   It is insolvent.   It assigns *all* its effects.

This view is sustained by some of the best American authorities.   19 Johns., 456.   6 Cowen, 217.   8 Cowen, 387. 1 Hopkins, 301.

In a case in 7 Johns. Ch. 217, usually cited to the contrary, the corporators continued to elect trustees, etc., after the assignment; so that, in fact, the corporate existence was expressly maintained.   And the decision in 6 Gill & Johnson, 205, also cited to the contrary, is made expressly to depend on the fact that the corporation could call in more capital, and resume business.

A. R. WRIGHT, I. T. SHUMAKE and H. W. HILLIARD replied as follows:

The law at the time of our adopting statute, required an *acceptance,* of a surrender, by the King, and enrollment thereof, to dissolve a corporation, whose charter was granted *by the King*: and a repealing act of Parliament, where charter was granted *by Parliament*.

Penobscot Broom Corp., vs. Lawson. 16 Maine, 224.   16 Maine, 314.   Grant on Corporations, 45, S. P.   Grant on Corporations, and notes, 39, S. P.   Grant on Corporations, 306–7.   1 Swan 164:   Angell & Ames, section 773.   Boston Glass Manufactory, vs. Langdon 24.   Hick., 49.   2 Kent. Com., 306 n. (a.)

In Georgia, therefore, an act of repeal, or acceptance of a

surrender is necessary to dissolve our corporations with their consent.   Code sections 1638, 1640.

But the omnipotent power of Parliament, and the power of the King, to dissolve corporations was qualified by the United States Constitution, which forbids acts impairing the obligation of contracts.   United States Constitution, Art. I, section X.

This charter is a contract between the State, on the one part, and Stockholders on the other.   4 Wheaton 518.   16 Geo. R., 289.   19 Geo. R., 325.   2 Kent Com., 306., s. p.

These bills are contracts between the bill-holder, on one part, and the corporation and stockholders on the other part. The liability of the latter is several, and ultimate.   19 Geo. R., 328. (4.)   Acts of 1853-4, p. 178.

Therefore, to dissolve charter, as between the State and stockholders, *both parties* must consent ; and there must be a repealing act, or an act of acceptance of a surrender, *by the General Assembly.* 4 Wheaton R., 518. 2 Kent Com., 306, s. p. Story on partnerships, section 268, section 118.   Story on Agency, section 49.   Broom's Legal Maxims, 681. 15 Pick., 351, 360.   Ang. & Ames on Corp., 657.   Grant on Corp., 307.   7 Cowen R., 45.   1 Swan, 164.   8 Peters, 281.   4 East., 327.   6 Geo. R. 130.   16 Geo. R. 289.

The immediate effect of such proceedings upon the bills before the Court, would be to release the *corporation* from its personal, immediate and primary obligation, and these contracts thus would be impaired to that extent.   Thornton *vs.* Lane, 11 Geo. R. 459.   Moultrie vs. Hoge, 21 Geo. R. 513. 2 Kent Com. 307, s. p.

According to the Bill of Exceptions, the question of surrender was decided upon, plea of assignee, and the facts set out, do not amount to a surrender in law.   7 Conn. Rep.. 45.   1 Swan Rep., 164.   Angell & Ames on Corporations, page 657. Angell & Ames, section 773.   16 Conn. R., 179.   20 Conn. R., 447.   Grant on Corporations 307, s. p., n. (h.)   24 Pick, 49.   3 DeSaussure 557.   6 Howard's Miss. R., 625, 681.   15 Pick. R., 351.   12 B. Monroe 77.

HARRIS, J.

The various grounds occupied in argument by plaintiff's counsel, are so numerous as to forbid a notice of all of them in this opinion. Were we under a necessity to discuss every matter drawn into the arguments, to which we have listened most patiently, it would impose on us the labor of writing a treatise on corporations ; for this, we have neither time nor inclination. Confined, as it will be, to such points as we deem most material, we will accompany their notice with such observations as we think will give an effectual answer to the strongest portions of the argument made in support of their position.

That position briefly is : That a Banking corporation may under the Code of this State, section 4th, paragraph 1685, by a voluntary surrender of its franchises, dissolve itself at *its will*; that to the resolutions of the corporators surrendering their franchises no subsequent legislative assent is necessary—that in effect an acceptance of such surrender has been given in advance.

This is certainly startling ; called upon for the first time to interpret the several clauses of the Code touching the dissolution of corporations, we have felt bound by a high sense of duty to consider carefully the position assumed and to weigh well the consequences which, if we were to accede to it, it would induce upon the interests and business of the State. Our profound and undoubted conviction is that it is unsupported by law and on principle untenable.

In no branch of the Common Law are the great and leading principles which control it more distinctly stated and illustrated than those touching the creation and dissolution of corporations. Elementary treatise after treatise has issued from the press, on both sides of the Atlantic, by Kyd and Grant, Angell and Ames, on Corporations. Besides these there are some valuable chapters on the same subject in Kent's Commentaries and very many decisions, which will enable any one who is patient in investigation to solve without difficulty

the questions made by the record.   Our task is the application of established principles to the plea of Mr. Metcalf.

It cannot be denied that all Banking corporations in America are the *creatures of legislative will,* and that no power to create such corporations belongs to either of the other departments of the State government.   Nor can it be denied that every act of the Legislature creating, a Banking corporation upon its acceptance becomes an executed contract between the State and corporation.   This principle, decided in Dartmouth College vs. Woodard, 4 Wheaton, places plaintiff in error, within the protection of the Constitution of the United States.   Under such protection it follows that the act creating the Mechanics' Bank as a corporation cannot be modified or repealed by the Legislature of Georgia without the free assent of the corporators, and then only when such alteration or repeal does not effect the rights of its creditors.   It may be safely asserted that the Legislature, its creator, has no power of *its will* merely to dissolve it.   As long as it performs its engagement by the Act creating it, it has a corporate existence within the limit of time fixed by the Act which can not be shortened.

This brings us to consider the grounds on which corporations (private) could be dissolved at Common Law.

They are :   1. Death of the corporators.   2. Surrender of charter accepted and enrolled.   3. Forfeiture.   Section 3, Burrows, Repts. 1866.

But counsel for plaintiff in error have gravely, and with seeming earnestness, asserted a dissolution of a corporation by a voluntary surrender, was unknown to the Common Law, that such a privilege was the creation of our Code, and upon this assumption rests the plaintiff's case.   Let us see if it can stand the test of examination.   It is said of corporations created by letters patent from the crown, that the King could not *ex mero motu* alter or resume his grant.   It could be dissolved upon the *free consent* of the corporators *surrendering* their franchises under the seal of the corporation.

. Grant on corporations, p. 303.   Rex vs. Lanier, Salk 168. 8, Meeson and Welsby, 1.

Here then we find that *surrender* was a mode whereby a corporation might be dissolved. It was *voluntary*, for it proceeded from the *free consent* of the corporators. The franchise could not be resumed *unless the grantees concurred.* Ibid. Thus we have the definition of *surrender ;* its characteristic is that it is *voluntary*, springing *from the free consent* of the corporators. Can more be necessary to satisfy the enquirer that a voluntary surrender was a mode whereby a dissolution of a corporation might be effected according to the Common Law? To make it complete, such surrender required *the assent or acceptance of the creator* of the corporation, *duly enrolled and of record.* The English authorities cited establish these doctrines.

Our Code, in enumerating the grounds whereby corporations are dissolved, but repeats those existing at Common Law. "Surrender" is one of them. In a subsequent clause, voluntary surrender is defined, thus clearly showing that in the minds of the codifyers they were one and the same mode.

An identity is thus shown between "surrender" at Common Law, and the surrender or voluntary surrender of the Code, proceeding alike from the *free will* of the corporators. 'Tis this which distinguishes them from another mode of dissolution by *forfeiture;* this last is the result solely of *coercion, compulsion by the judgment of a court.* In England *the surrender* was required to be made *to the creator* of the corporation. In Georgia, the Code requires it to be made to the State, by which the Legislature, as the creator by law of Banking corporations, must necessarily be understood.

It should be kept in mind that the codifyers were commissioned to embody the principles of the Common Law in force in Georgia; they had no authority to originate new matter for legislative sanction. It therefore is incumbent on those who assert that they went beyond their commission, and especially in reference to the subject of dissolution of corporations to prove it. It has been assumed in argument by plaintiff in error, that familiar as they were with the difficulties which had hitherto existed in the dissolution of Banking corporations, they intended, and did actually, by section 1685,

allow of voluntary surrender, so as to remove the restraints which had existed at common law to dissolution, by not requiring either assent to, or acceptance of such surrender by the creator.

There can be no greater misapprehension of what was done or intended, both by the codifyers and the legislative committee, which revised the Code and recommended its adoption, than to impute to them an intention to release any exis'ing restraints on this class of corporations.   Why should they ? A strong, and I might add, an ineradicable hostility to them, pervaded the public mind.   Bank corporators had been for years, stigmatized, in the cant of low demagogues, seeking popularity in their assumed guardianship of the rights of the people, as aristocrats rolling in wealth, privileged usurers, monopolists of the rights of the poor, etc., etc. And these misrepresentations and falsehoods had become the orthodox and intolerant creed of the masses.   Poisoned, as public sentiment had been, and then was, it would have been utterly impracticable to have made such a change.   A further, and to my mind a conclusive refutation of such conjecture, is to be found in the significant fact, that so far from tolerating a disolution at the mere will of the corporation, the Legislature, in a previous paragraph in the same section, reserved to itself, in reference to all Banking corporations, to be thereafter created, the unusual and extraordinary power of withdrawing at its pleasure, the franchises which it had granted, unless otherwise stipulated in the charter.   A power thus retained, co-extensive with the power of the British Parliament in theory, a power which if exerted, (and who doubts that it will not be) which virtually divests the Judiciary of the duty of dissolving these corporations by judgment of forfeiture for an abuse of their charters, with or without grounds, summarily, and perhaps capriciously, resuming the Banking franchises, which it had granted, surely furnishes no argument in support of the assertion of counsel.

Nor will it be an easy task to reconcile the conjecture asserted with the other fact in the Code, of the special reservation, to the Legislature *solely*, of the right to create Banking

and Insurance corporations—whilst to the Courts the power of creating nearly all other kinds of corporations is assigned. Do either of these reservations of power indicate relaxation of restraint? They indicate, most clearly, increased rigor. The assertion then made, finds no support in facts which cannot be reasoned out of existence.

Still another idea is advanced in support of the assertion that a change was intended, and made by the Code, of such apparent plausibility as to require notice. It is that upon a voluntary surrender of the Banking franchise, the liability of the officers and members is preserved to the creditors, notwithstanding the dissolution, and this being so, there could be no sound reason why a dissolution should not take place at the will of the corporators alone. Is not a corporation, when dissolved, extinct? Its powers, privileges, vitality, and name are lost by its death. These consequences may or not ensue, all, however, are not dependent on the existing legislation. Thus, where a corporation is dissolved by *judgment of forfeiture*—by statute, the use of the corporate name is retained, with a view to collect in the debts due to the extinct corporation—but no power of suit against the dissolved corporation in behalf of its creditors is given, presenting the anomaly of an extinct corporation capable of suing, but incapable of being sued. But under the Code, where a Banking corporation is dissolved *by a voluntary surrender of its franchises* to the State, and an acceptance thereof, the use of the name of such dissolved corporation has not been retained for *any* purpose.

The result of this will be, that a bill-holder of such Banking corporation, if he has omitted to sue and obtain judgment against it before its dissolution, is thereafter precluded from suing it and obtaining judgment. Without judgment, he can have no execution; without execution, there can be no return of *nulla bona;* without such a return, the *insolvency* of such banking corporation is not ascertained with such certainty as to enable the bill-holder to prosecute his action against the stockholders, under what is termed the liability clause, found in most of the Bank charters. Viewed, as the

stockholder has been under that clause, as a *guarantor* for the corporation under the repeated decisions of this Court, it must be apparent that the *successive steps indicated above must be taken before the unpaid bill-holder can reach the guarantor.*

May it not be asked in what consists the effectual protection of the interests of the general creditors of the Banking corporations dissolving by voluntary surrender at their own pleasure?

The fact is undeniable that no suit can be maintained, as the law now stands, against the corporation when dissolved.

Suppose the dissolving Bank appoints an assignee; the assignee does not so stand in the place of the corporation, as to authorize the corporation to be bound *generally* by any judgment against such assignee. If a judgment could be had at the instance of the bill-holders against the assignee, and a return of *nulla bona* was made on the execution issued thereon, such return would not furnish, of itself, *satisfactory* evidence of the insolvency of the corporation so as to allow the bill-holder to prosecute the guarantor. At most, such judgment against the assignee and return upon the execution, would prove that there were no assets of the Bank in the hands of the assignee. The insolvency of the Bank, and the want of assets in the hands of the assignee, are not convertible terms.

Where is the boasted protection afforded bill-holders after dissolution by surrender? True, the Code continues alive the liability, but how are the corporators ever to be reached as guarantors, when the corporation has been permitted to commit suicide, escaping from existence, the law having provided no mode whatever of enforcing, in such a case, the ultimate liability of the stockholder? This, in truth, is "holding the word of promise to the ear and breaking it to the hope."

So much in answer to the position taken in argument by counsel. That they have been forced to occupy this line, is the result of the fact in the record; there was no other mode by which they could, with any plausibility, evade the call made on them, to exhibit the *assent of the Legislature to the*

*surrender* set up in the plea of Mr. Metcalf, the last elected President of the Mechanics' Bank.

The plea exhibits the resolution of the corporators to surrender their Banking franchise, and that such resolution was communicated to the Governor of Georgia, but it contains no allegation of assent to such surrender by the Legislature, or even by the Governor, nor exhibits any resolution, ordinance or Act of the Legislature from which an acceptance might be inferred.

Counsel have throughout confounded the resolution to make a surrender, with an actual dissolution of a corporation. These things are entirely distinct, proceeding from *different* parties. A *surrender is not a dissolution ;* it is but a mode, a way, a mean to an end. The corporators consent to surrender their franchise, tender it back to the Legislature, and ask to be dissolved as a corporation. This is their *free* act, and proceeds from *one* party to the contract. If the surrender is formal under the seal of the corporation, and the Legislature, the *other* party to the contract, in behalf of the State, accepts it, by an Act or ordinance in some authoritative form, and that is authenticated as law and ordinances usually are, *then, and not till then,* is the dissolution of the corporation upon *surrender* and the evidence of it complete.

Carrying throughout the idea of the Act creating this Banking corporation being a contract, and the general law of contracts that they cannot be dissolved, but upon the consent of both parties, and through similar forms to those used in making the contract, our astonishment is, that a procedure so simple does not at once suggest itself to the common sense of intelligent men as the appropriate and natural mode of effecting by a surrender, the dissolution of a corporation. This mode is in accordance with the principles and invariable course of the Common Law, and is pursued in most of the States of the American Union. Our Code, whilst it but repeated the grounds whereby dissolutions of corporations were effected at Common Law, has omitted to prescribe any forms to be pursued. This is not surprising, as in condensing the leading principles of the Common Law the codifyers were

The Mechanics' Bank *vs.* Heard.

constrained to exclude details necessarily inferential, without specification. Adopting the grounds of dissolution at Common Law, the Code could have but contemplated that those grounds should be executed in the forms of the Common Law.

Now corporations in Great Britain were created either by virtue of the Royal prerogatives, or by Act of Parliament; if by the Crown, by letters patent under its *seal* and duly *enrolled;* if by Parliament, by an Act of the three estates duly enrolled and with the great seal attached.

In the case of Crown grants, when dissolved *upon surrender* by the grantees, the *acceptance* of the King of such surrender was required to be *enrolled* and of record. 3 Burr. Repts., 1866. 1 Woodesson's Lectures, 500. 1 Salk Rep., 191. Parliamentary could only be dissolved by *Act* of Parliament. See Grant on Corporations.

The foregoing are familiar principles regulating the creation and dissolution of corporations, and they are in accordance with a maxim prevading the Common Law in other departments. *Nihil tam conveniens est naturali æquitati quam unum quoque dissolet eo ligamine quo ligatum est.*

Again, "a corporation aggregate, may *surrender* and in that way dissolve itself, *but then the surrender must be accepted by government, and be made by some solemn act to render it complete.*" 2 Kent's Com. 209.

An act of the Legislature repealing the act of incorporation passed *with the assent of the corporators,* would undoubtedly be sufficient to effect a dissolution. Revere vs. Boston Copper Co., 15, Pick. R., 351.

The *surrender* must be by a formal act of the corporation under seal; *and it cannot avail but by an acceptance of such surrender by an enrolled act or law. There must be the same agreement to dissolve as to make. The power in a corporation to dissolve by its own Act, is too dangerous to be supposed to exist.* See Boston Glass Co. vs. Langdon. 24 Pickering Repts., 49.

In this country, where corporations are usually created by Act of the Legislature, no mode of *surrender* is pointed out by the books as necessary to be pursued, differing from that

28

in England, where corporations are usually created by charter from the Crown. It is said *a surrender, if accepted,* will be sufficient. Angel and Ames on corporations, 638. 2 Kent. Com., 250. 15 Pick. R., 351.

As the identity of surrender at Common Law, as a mode of dissolution of a corporation, with the *surrender* defined by the Code, cannot but be conceded by every lawyer, who will take the trouble of investigating the subject, and no mode or form is prescribed by the Code, as necessary to be pursued in order to make it effectual, there seems to me no escape from the necessity of alleging, and in support of such allegation exhibiting, some Act or ordinance of the Legislature, approved by the Governor, assenting to or accepting the *proposed surrender* of their franchise by the Mechanics' Bank.

A dissolution, at the will of corporators, would leave no evidence of the surrender but the entry of the resolution of the corporators on the minutes of the Bank, and when thus dissolved, who can say where will be the depository of the minutes?

In fine, the proposition of plaintiff in error involves, besides what has been said in reference to it, this striking inequality, that a law containing a contract of the highest importance between the corporation and the State, may be set aside and annulled *at the will* of the corporators, by a mere resolution, notice of which is given to the Governor, whilst the State cannot alter or repeal that law, or resume the franchises granted, or compel their delivery up, or cause a dissolution of that corporation, but upon some ground of forfeiture judicially established and the judgment thereon of a competent Court. Such inequality between the rights of contracting parties as flows from the position of plaintiff's counsel, demonstrates the absurdity of such position.

Faulty as is doubtless much of the legislation of the State, it will be no light task to demonstrate, from the Code, such want of foresight touching the dissolution of Banking corporations as the argument of plaintiff's counsel, throughout, imputes.

The plea of Mr. Metcalf being shown to be defective in

several allegations necessary to be made, and not being supported by any proof whatever of the assent of the Legislature to the proposed *surrender* of its franchise by the Mechanics' Bank, cannot be sustained.

We are, therefore, brought to the conclusion that the Mechanics' Bank was not dissolved by the resolution of its corporators, and that when the suit of the plaintiff below was instituted *it was an existing Banking corporation,* and that service was rightfully made on Thomas Metcalf, its last President.    This decision carries along with it the other pleas in the record.

Judgment affirmed.


WALKER, J., dissenting.

When this case was decided, I reserved the right to dissent, in case I could not, on reflection and examination, bring my mind to concur in the judgment rendered.    Further reflection and investigation has satisfied me that my doubts were well founded, and the decision was wrong.    I will give my reasons for so thinking.

There is no difference between the majority of the Court and myself, except as to the construction of our own statutes. I concur with them as to what the Common Law was; but I differ with them as to the meaning of our statutes.  What are the provisions of these statutes?    Rev. Code, sec. 1683, says: " Every corporation is dissolved   *   *   *   by a surrender of its franchises."    Sec. 1685 says:   " A corporation may be dissolved by a voluntary surrender of its franchises to the State.    In such case, such surrender does not relieve its officers or members from any liability for the debts of the corporation."    Sec. 1687 says:   " Upon the dissolution of a corporation for any cause, all of the property and assets of every description belonging to the corporation shall constitute a fund—first for the payment of its debts, and then for equal distribution among its members.    To this end the Superior Court of the county where such corporation was located, shall have power to appoint a receiver, under proper restrictions,

properly to administer such assets under its directions." Sec.
1688: "The dissolution of a corporation from any cause
shall not in any manner affect any *collateral* or *ultimate* or
*other liability,* legally incurred by any of its officers or mem-
bers." By section 1492, where a Bank charter is forfeited by
the judgment of the Court, at the instance of the Governor,
"the Judge shall pronounce .the judgment for all purposes,
whatever, saving the use of its corporate name, in collecting
and paying its debts, and in conveying its real and personal
estate, which power shall be exercised by a receiver appointed
by the Court for that purpose." Section 1499 says: "When
a Bank surrenders its charter, or the use thereof, it may make,
in good faith, an assignment of all its effects for the payment
of all its debts, as natural persons may, but it cannot thereby
prevent such preference among its creditors as the law gives."
Section 1500 provides that any creditor or stockholder may
move the Court within six months to set aside the assignment;
and, "if the assignment be set aside, a receiver must be
appointed." Read in the light of the other sections quoted
what does section 1685 mean by saying, "a corporation may
be dissolved by a *voluntary* surrender of its franchises to the
State?" And what does section 1683 mean when it says,
"every corporation *is* dissolved   *   *   by a surrender of its
franchises?" "Is dissolved by a surrender," and on a dis-
solution, for any cause, the property shall constitute a fund—
first for the payment of the debts of the corporation. Section
1687.

Under the old law, a corporation might propose to surren-
der its franchises, and the proper authority could accept or
reject, as it might see proper, according to the circumstances
of the particular case. Under the Code the offer to accept
the surrender is held out to all the corporations in the State,
and they may make "*a voluntary surrender*" whenever they
may choose to do so. The corporation thus ceases to exist
and the law provides what shall be done with its assets. A
Bank may make an assignment of all its assets, and if done
in good faith, the assignment will be upheld, otherwise, the
assignment will be set aside and a receiver appointed; and a

receiver is provided for in all cases where such an officer may be needed. The difference between the old law and the Code is, that by the former the acceptance of the surrender was subsequent to the tender, and by special action in each case, while by the latter a general rule is prescribed by which all corporations may voluntarily surrender their charters; the State having in advance provided for their acceptance, and provided for the distribution of the assets very much as in cases of the death of natural persons. · The State, one party to the contract, by the charter, says the corporators may cease to be a corporation by a voluntary surrender; and when such dissolution of the corporation takes place the assets may go into the hands of an assignee or receiver, and be disposed of in a certain way. When the corporators accept the terms by a voluntary surrender, there is an agreement between them and the State as to how the corporation is to be dissolved; the act of acceptance is already passed, and what shall be done with the corporate assets already provided by law. In order that the rights of third persons may be protected, the assets of the corporation are to be first applied to the payments of its debts, and if a Bank is insolvent, the order of paying off the debts shall be the same as is prescribed in cases of administration, to the extent applicable, except where special preference or postponement is given by law. Rev. Code, sec. 1495. If there still be debts outstanding after the assets of the corporation are exhausted, section 1688 comes in and says: "The dissolution of a corporation *from any cause* shall not in any manner, affect any collateral or ultimate or other liability, legally incurred by any of its officers or members." Take the whole of the ·provisions together and they seem to be amply sufficient to guard the rights of all. The question simply is, whether a corporation may terminate its existence or not, the rights of all persons being fully protected by law. If such was not the intention of the Legislature, I am very much mistaken. I cannot understand several of the provisions of the statute unless they intended a general rule by which corporations might effect their own dissolution by means of a voluntary surrender. If

the intention was to give authority to corporations to surrender their franchises at will, and cease to exist as corporations, then all the provisions seem to harmonize with this intention, and the guards thrown around seem to be sufficient to protect the rights of all concerned. As a matter of policy I see nothing wrong about it. If the corporators wish to surrender their franchise, why not let them do so, and let the corporation be dissolved? The corporators so wish. The assets are to be applied first, to the payment of the debts of the corporation, and then to be distributed among the stockholders. If there be debts still due, after the assets are exhausted, collateral, ultimate and other liabilities of the officers and members are not in any manner affected by the dissolution. It follows that, I think, when the charter had been voluntarily surrendered, the corporation ceased to exist, and the Court ought to have so held.