# CASES ARGUED AND DECIDED

IN THE

# Supreme Court of Georgia.

## MARCH TERM, 1895.

GILLIS *et al.* v. GILLIS *et al.*

1. Construing together sections 2414 and 2415 of the code, which relate to the execution and attestation of wills, the true meaning of the phrase " provided he can swear to the same," as used in section 2415, with reference to the competency of an illiterate or infirm witness, is that such a witness is competent to attest by his mark if, at the time of attesting, he is under no legal disability to testify as a witness; and it is not essential to his competency as an attesting witness to a will that he should be able to swear to, or identify, his mark at the time the will is offered for probate.
2. Where upon the trial of an issue of *devisavit vel non* a subscribing witness to the will, from want of memory or other cause, is unable or unwilling to testify to its attestation by himself or by the other subscribing witnesses, or to the execution of the will by the testator, or to the fact that the testator was mentally capable of making a will; or, where a subscribing witness in his evidence denies the existence of any of these facts, the same may be proved by any competent witness having knowledge thereof, although the latter was not a subscribing witness to the will.
3. The law of mutual wills was not involved in the present case ; the evidence warranted the verdict, and there was no error in denying a new trial.

March 11, 1895. Argued at the last term.

Appeal. Before Judge GAMBLE. Emanuel superior court. April term, 1894.

WILLIAMS & SMITH, HINES & HALE and FELDER & DAVIS, for plaintiffs in error.

CAIN & POLHILL, EVANS & EVANS, ALFRED HERRINGTON, F. H. SAFFOLD, H. R. DANIEL and H. D. D. TWIGGS, *contra.*

LUMPKIN, Justice.

The nominated executors of the alleged last will of Sarah Gillis propounded the same for probate, and a *caveat* was filed by some of her heirs at law. On the trial in the superior court, to which court the case had been carried by appeal, there was a verdict for the propounders; and the caveators bring up for review a judgment overruling their motion for a new trial. Besides the general grounds that the verdict was contrary to law and the evidence, and that the court erred in refusing to grant a nonsuit, the motion contained special grounds raising certain questions, the nature of which is disclosed by the head-notes and this opinion.

The paper purporting to be the will was executed by the testatrix on the 12th day of March, 1873. It bears the names of four witnesses, but it was conceded that the last of them signed his name some time after the execution of the paper by the testatrix and its attestation by the other witnesses, and it does not appear that he signed in her presence. The appearance, therefore, of the name of this witness upon the paper counts for nothing in determining the question of the legality of its execution. Accordingly, the fact that he signed will be ignored altogether, and it will be understood that in speaking of the subscribing witnesses to the paper, reference to the other three only is intended. One of these signed by making her mark. Another died before the testatrix. The usual and formal attestation clause was used. The paper was offered for probate soon after the death of the testatrix, and about twenty years after its execution and attestation. At the time of probate, the two subscribing witnesses then in life were produced. The one who wrote his own name proved the due execution of the paper as a will. The signature of the de-

ceased witness was shown to be in his handwriting. The illiterate witness testified that she had no recollection of attesting the will, and could not swear to the making of her mark. At the same time, however, she did not expressly swear that she did not attest by her mark the paper propounded.

1. The first and leading question is: Was the paper legally attested as a will? The execution and attestation of written wills in this State, as to both real and personal property, is provided for in sections 2414 and 2415 of the code. Section 2414 reads as follows: "All wills (except nuncupative wills) disposing of realty or personalty, must be in writing, signed by the party making the same, or by some other person in his presence, and by his express directions, and shall be attested and subscribed in the presence of the testator by three or more competent witnesses." Section 2415 declares that: "A witness may attest by his mark, provided he can swear to the same; but one witness cannot subscribe the name of another, even in his presence and by his direction." Section 2414 was codified from section 5 of 29 Charles II, ch. 3, known as the "statute of frauds," in reference to devises of real property (Cobb's Dig. p. 1128, *Huff* v. *Huff*, 41 *Ga.* 701), and from an act of January 21, 1852 (Acts of 1851–2, p. 104), which prescribes that wills bequeathing personal property shall be executed as are wills devising real property. The statute of frauds and our own act of 1852 each uses the word "credible," and section 2414 of the code uses the word "competent," as to the three or more witnesses required to attest a will. These two words are, as here used, synonymous. *Hall* v. *Hall*, 18 *Ga.* 40. They mean, in this connection, witnesses who are competent at the time of attestation to testify in a court of justice.

Thus, in one of the earlier English decisions, it was said: "The true time for his *credibility* is the time of

attestation; otherwise, a subsequent infamy, which the testator knows nothing of, would avoid his will." Holdfast on Demise of Anstey *v.* Dowsing, 2 Strange, 1253. In Sears *v.* Dillingham, 12 Mass. 358, the court, after stating that an executor was not a competent witness to prove the execution of a will, said: "But a will to which such an executor is a subscribing witness may be proved by the testimony of the other witnesses, he having been a *credible* witness within the statute at the time of his attestation, and having become incompetent only by accepting a trust." In Patten *v.* Tallman, 27 Me. 17, it was said: "The competency of an attesting witness to a will is not to be determined upon the state of facts existing at the time when the will is presented for probate, but upon those existing at the time of the attestation." So very pertinent, in this connection, is the text of Schouler on Wills, that we make an extended extract: "Upon common-law principle, the qualification or disqualification of a witness is usually raised with reference to the time when he is called upon to testify. Nor is competency at that date to be left unconsidered; as where, for instance, a witness who subscribed while in sound mind has become insane by the time the probate of the will is at issue, in which case, of course, his testimony cannot be taken. But his incompetency at this latter date does not defeat the will, whose attestation and subscription was a sort of testifying, such as the peculiar transaction called for. To surround himself with a specified number of witnesses at that time competent, was all that any testator could do in compliance with the statute requirements; and what was then a proper execution in all respects taking place, a will was produced whose validity could never be impeached for informality. Hence the rule, which reason should now pronounce the universal one, so far as the question remains a material one at all, that the competency of wit-

nesses, like that of the testator, is tested by one's status at the time when the will was executed. If, therefore, a sufficient number of witnesses attest and subscribe properly, who at that date are competent, the will remains valid, although death or supervening disability may render any or all of them incapable in fact of testifying by the time the will is offered for probate. In other words, the inconvenience of this last situation is purely casual and incidental, and without direct prejudice to the will itself, which might, indeed, be established on mere proof of handwriting, where the instrument appeared on its face genuine and formal." §351. See also §350; and Jarman on Wills (R. & T.'s ed.), p. 225; Higgins v. Carlton, 28 Md. 115, 92 Am. Dec. 666, and note on page 680; Hawes v. Humphrey, 9 Pick. 350, 20 Am. Dec. 481, and note on page 488; Adams v. Fellowes, 5 Mass. 219; Carlton v. Carlton, 40 N. H. 14; Holt's Will (Minn.), 57 N. W. 219.

A witness who signs by his mark, if so capable of testifying, is just as competent a witness under the statute of frauds, our act of 1852 and section 2414 of the code, as one likewise capable of testifying who writes his own name. This is settled by an unbroken line of authorities. Harrison v. Harrison, 8 Ves. 185; Addy v. Grix, Ib. 504; Doe d. Davies v. Davies, 9 Adol. & El. 648; Bailey v. Bailey, 35 Ala. 687; Garrett v. Heflin (Ala.), 13 So. Rep. 327; Horton v. Johnson, 18 Ga. 397; Montgomery v. Perkins, 2 Met. (Ky.) 448, 74 Am. Dec. 419; Lord v. Lord, 58 N. H. 7, 42 Am. Rep. 565; Compton v. Milton, 12 N. J. L. 70; Morris v. Kniffin, 37 Barb. 336; Pridgen v. Pridgen, 13 Ired. (N. C.) 260; Simmons v. Leonard, 91 Tenn. 183, 30 Am. St. Rep. 875; Jesse v. Parker, 6 Gratt. (Va.) 57, 52 Am. Dec. 102; 4 Kent (8th ed.), 575; 10 Bacon's Abr. 491; Williams on Ex'rs (3d Am. ed.), 79; Beach on Wills, §41; 1 Jarman on Wills (R. & T.'s ed.), 213, 214; Schouler on Wills, §331;

1 Am. & Eng. Enc. of Law, 941. And indeed our code expressly declares that, "'Signature' or 'subscription' includes the mark of an illiterate or infirm person." §5. The mark is the signature of the witness. Century Dict. word "Signature"; 14 Am. & Eng. Enc. of Law, 457, word "Mark"; Anderson's Law Dict. words "Mark" and "Signature." The subscription of a witness, whether in his own handwriting or by his mark, does not, of course, *ipso facto*, make such witness competent, because at the time of attestation he may be disqualified by law from testifying in a court of justice, on account of infancy, imbecility, crime, or for other causes.

But for the proviso in section 2415 of our code, it cannot be reasonably doubted that the true test for determining the competency of any witness to the execution of a will in this State would certainly be whether or not the witness, at the time of attestation, would be disqualified from testifying in a court of justice. The rule as to witnesses generally, unless changed by that proviso, is beyond question applicable to "markmen." Did the words, "provided he can swear to the same," referring to a witness unable to write his name and who attests by his mark, change the rule? Omitting from the section the words just quoted, the mark of the witness, he being legally capable of testifying when he made it, would be good without any further condition. Suppose he should die, or become blind or insane; corruptly refuse to testify to what he knew; forget, or be inaccessible; and, for any of these reasons, did not, at the time of probate, in fact swear to the mark, but the other two witnesses did swear that he made it, and proved all other essential facts, must the will fail?

The proviso is new. After very diligent search and inquiry, we have been unable to discover even a trace of it in any book other than our code, where it appears for the first and only time. Can it be possible that it

was intended to revolutionize the law on the subject, and make the validity of a will depend upon the life, the eyesight, the continued sanity, the integrity, the memory, or the accessibility of witnesses? No court should so hold, unless constrained by the plainest language to do so. We do not feel so constrained in the present instance. To construe section 2415 as contended for would be to open the door for endangering or destroying all wills. It would be contrary to the old law, and not in harmony with the spirit of the code. Such an unwise and dangerous innovation should come in language able to withstand the severest verbal criticism. If it be expressed in doubtful phrase, construction may turn aside the danger. See *Walker et al.* v. *Hunter et al.*, 17 *Ga.* 409; *Deupree et al.* v. *Deupree et al.*, 45 *Ga.* 441–443. If the test of the legal competency of the witnesses is to be applied only at the time of probate, a will might be defeated in many ways. If the witness had died before that time, he could not possibly swear to his mark. If he had become blind, he could not see the mark and therefore could not swear to it. He might remember all the circumstances, and know that he did make his mark to a will which was properly executed, but without the aid of his lost vision he could not swear to it. If he had lost his mind, he could swear to nothing. If he falsely testified that he could not swear to the mark, he would thus defeat the will, and with small risk, for it is always difficult to convict any person of perjury, ·and hardly possible to do so when the alleged false evidence relates to a mental state of the witness himself. If he had honestly forgotten, or could not really identify the mark as his own, the same result would follow. If he was inaccessible or his whereabouts unknown, the mark would remain unsworn to by him.

Surely neither the original codifiers nor the General Assembly can be supposed ever to have contemplated the

defeat of a will in any of these ways. If the time for applying the test of competency as to an illiterate witness is when the will is offered for probate, it necessarily follows that in order to make the subscription of such a witness valid, he must then swear to his mark, or else he does not count at all as a witness to the will. Accordingly, counsel for the plaintiffs in error contended that as the illiterate witness in this case, on account of her failure of memory, could not and did not swear to her mark, her attestation amounted to nothing, and consequently there were but two legal witnesses to the will, and it was therefore void.

We cannot think this contention is sound. It goes beyond even the letter of the section under construction. It assumes that the compilers of our code *made* a new law, and did not *codify* an old law. It "builds, like the martlet, on the outward wall." It leads to patent absurdities. It ignores the fact that sections 2414 and 2415 are *in pari materia*, and must be construed together. It adopts, from two constructions, the one that defeats, rather than the one that upholds, the real purpose of the law. It overlooks the rule that if the language of any part of section 2415 is devoid of sense, it may be eliminated by the court altogether. It makes the competency of the witness at the time of attestation dependent on his memory or will, or other contingency, at the time of probate. It departs from established authorities, which are laws themselves, the overturning of which would unsettle property rights. It would enable a contestant to defeat a will by successfully tampering with a witness before the trial. And it does not include or suppose the possibility of an illiterate or infirm witness, if in existence, being voluntarily beyond the process of the court, or his whereabouts being unknown at the time of probate, nor of the death or insanity of such witness before that time. "The

presumption against absurdity in the provision of a legislative enactment is probably a more powerful guide to its construction than even the presumption against unreason, inconvenience or injustice. The legislature may be supposed to intend all of these; but it can scarcely be supposed to intend its own stultification. Accordingly, it has been said that, when to follow the words of an enactment would lead to an absurdity as its consequences, that constitutes sufficient authority to the interpreter to depart from them." Endlich on Statutes, §264; and see also §295. Moreover, "in making it requisite to the validity of a will that there should be attesting witnesses who shall subscribe their names to the writing, the law has a threefold purpose: the identification of the paper, the protection of the testator from deception and fraud, and the ascertainment of his testamentary capacity." Beach on Wills, §39. The three reasons here specified are fulfilled by having three *competent* witnesses who are not disqualified at the time of attestation from testifying in a court of justice. Therefore, if an illiterate or infirm person, who is requested by a testator to attest his will, is not so disqualified, he is a competent witness to the will, because he is then competent to testify on the three points mentioned, as well as on any others relating to the *factum* or validity of the will.

Whatever evils may exist in having illiterate or infirm persons, who are otherwise competent, to attest wills by their marks, it is shown by a uniform current of decisions, and by the opinion of all text-writers, that the sages of the law, from the earliest times to the present, have upheld the attestation of wills by such witnesses making marks for their signatures; and they have never set forth a reason for any change in the law. In the well-considered case of Pridgen *v.* Pridgen, *supra*, Nash, J., delivering the opinion of the court, says: "To

subscribe is to set one's hand to a writing. If, then, the statute is, on the part of the testator, in this particular, complied with by making his mark, why is it not satisfied by the witnesses making their mark? The inconvenience and danger of defeating wills by allowing witnesses to attest them who cannot write, have been strongly urged in the argument. On the other hand, many evils might grow out of a rule confining the attestation to those only who can write." *A fortiori,* how many evils would exist, as already shown, if the contention of the caveators in this case should be upheld.

There is no act of our legislature or decision of our Supreme Court, before the adoption of our code, that ever changed, or attempted to change, the old law as to witnesses attesting wills by their marks; and there is at least one case decided by this court, before the code went into effect, which is in harmony with and upholds that law. See *Horton* v. *Johnson,* 18 *Ga.* 397. How, then, can it be said that the compilers of our code intended to incorporate into it any other than the prevailing rule of law? It is not to be presumed that they, learned in the law, would, except in rare instances, themselves make a rule of law, when they were only empowered to codify existing laws of force in this State. See act of December 9, 1858; *The Mechanics' Bank* v. *Heard,* 37 *Ga.* 412; *Phillips* v. *Solomon,* 42 *Ga.* 195, 196; *Gardner* v. *Moore,* 51 *Ga.* 269; *The City of Atlanta* v. *The Gate City Gas Light Co.,* 71 *Ga.* 106, 119, 120 ; *McDaniel* v. *Campbell,* 78 *Ga.* 188. At any rate "the code is not to be construed as changing the old law, unless the change be very apparent" (*Gardner* v. *Moore,* and *City of Atlanta* v. *Gas Light Co., supra*); or, "unless the intent to change be clear," as stated in *Phillips* v. *Solomon, supra.* It is, therefore, reasonable to conclude that the codifiers did not intend to create a new rule in Georgia as to the attestation of wills by illiterate or infirm per-

sons, which would, in the manner above pointed out, so seriously affect the validity of wills so attested. It is hardly probable that they would have inserted the words, "provided he can swear to the same," if they had supposed they would receive the construction now contended for by the plaintiffs in error.

In our opinion, the true interpretation of section 2415 is found by construing it with section 2414. They are *in pari materia.* Indeed, they cannot be separated, because they relate to the same subject-matter. The rule of law applying to statutes that are *in pari materia* is, that "where there are earlier acts relating to the same subject, the survey must extend to them; for all are, for the purposes of construction, considered as forming one homogeneous and consistent body of law, and each of them may explain and elucidate every other part of the common system to which it belongs." Endlich on Statutes, §43, and note thereto, where many authorities are collated. This rule applies with peculiar force to sections of our code relating to the same subject-matter, and which were codified at the same time, because they must be construed, if possible, to harmonize with each other. *Bealle* v. *The Southern Bank of Georgia,* 57 *Ga.* 274; *Thomason* v. *Fannin,* 54 *Ga.* 363. As was said in the latter case: "If a fair construction can be adopted to prevent such a contradiction by one section of the other, it should be done."

Section 2415, read with section 2414, shows that an illiterate or infirm person may attest a will by his mark. Standing by itself, it does not show what the witness is to attest. The whole section is evidently codified from the case of *Horton* v. *Johnson,* 18 *Ga.* 396, which holds that if another witness signs the name of an illiterate witness, it is an illegal subscription, unless the illiterate witness affixes his mark; and from the case of *Hall* v. *Hall,* 18 *Ga.* 40, in which it was decided that any wit-

ness to a will is competent, provided, at the time of at-
testation, he is not disqualified from testifying in a court
of justice. This is made plain when section 2415 is
construed with section 2414, which, as already stated, is
codified from section 5 of the statute of frauds and our
act of 1852, which place all witnesses, learned and un-
learned, vigorous or infirm, upon the same footing, and
render them competent witnesses to a will if by law they
are not, at the time of attestation, disqualified from tes-
tifying in a court of justice.

It was argued that as section 2414 of the code dis-
tinctly declared, in effect, that all the witnesses to a will
must be "competent," *i. e.*, capable of testifying, and by
its terms necessarily embraced witnesses who could not
write their names, the words, "provided he can swear
to the same," used in the next section with reference to
a witness attesting by his mark, would be merely tauto-
logical, if regarded simply as repeating the necessity
for competency already plainly and unequivocally re-
quired. The force of this position cannot fairly be
ignored. In it lies the main strength of the argument
on the other side of the question; for it gives much
plausibility to the contention that the purpose of the
words last quoted was to limit, to some extent, the com-
petency of infirm or illiterate witnesses, by requiring
that they should possess at least one other qualification
than mere legal capacity to testify, viz: the ability to
swear to their marks.

It would be unreasonable, if not absurd, to construe
the words "can swear" as meaning that the witness
must have the requisite memory and the keen physical
perception which would enable him, after the lapse of
weeks, months or years, to distinguish and identify a
mere cross mark or other ordinary device representing
his signature. This would certainly be very difficult,
if not altogether impossible, if the mark had no pecu-

liarities.  It is much more reasonable to refer the ques-
tion of ability to swear to the mark, not to recollection
or accuracy of vision, but to legal capacity to testify.
Synonymous with the word "can," in the connection in
which it is used in the *proviso* under consideration, are
the expressions, "is able to;" "has the power to;" "has
the ability to;" "is competent to;" "has the capacity
to;" or, negatively speaking, "is not unable to;" "has
not the lack of power to;" "has not the inability to;"
"is not incompetent to;" "lacks not the capacity to."
Surely, something must be supplied to this *proviso* by in-
ference in order to give it sense or meaning.  We must
thus supply the means from which the witness "can"
swear, etc.  Is it by reason of his retentive memory, or
any other inherent power?  Or, by reason of a power
which does not spring from his own physical or mental
capacities as a person in a natural state, but is conferred
upon him by law as a member of society?  It would not
be straining to substitute the synonymous phrase, "is
competent to," for the word "can," so that the *proviso*
would read: "provided he is competent to swear to the
same."  Had the codifiers used this language, certainly
it could not be said that the competency they had in
view was his ability by reason of *memory*, rather than
his ability to stand the tests which the law applies to all
persons alike in passing upon their fitness to testify as
witnesses.  It is because of the overwhelming and de-
structive force of natural laws, that the only requirement
which human law can exact is that the witness must, at
the time of attesting, be able to stand the test of com-
petency prescribed in all cases; and it matters not
whether he afterwards loses that competency or not.
Illiterate or infirm witnesses simply stand upon the same
footing as all others; illiteracy or infirmity will not
count against them, but they must, in other respects,
come up to the legal standard of competency by which
those who wield the pen are measured.

We do not mean to insist that the suggestions just made eliminate the tautology. They cannot, for it is there, if the words, "provided he can swear to the same," mean what we think they do. But granting they are tautological, or even meaningless and utterly useless, if the foregoing argument is worth anything at all, it establishes the conclusion that it is safer and better to thus treat them than to give them a meaning not only out of harmony with all the law, but leading to consequences which the codifiers, we may almost say with certainty, did not anticipate.

In the argument here, our attention was called to the case of *Thompson et al.* v. *Davitte et al.*, 59 *Ga.* 472, as somewhat in point, because it there appeared that an attesting witness, when called upon to prove the execution of a will, stated his unwillingness to swear positively to a mark purporting to be made by him, although he said he thought he made it. That case has, however, afforded us no aid in reaching our present decision; for the only point there was, whether a mere statement by a witness of his belief could be regarded as affirmative evidence, and no construction of section 2415 of the code was then attempted. Indeed, so far as we have been able to ascertain, this court has never before been called upon to construe that section.

The correctness of the views upon this question we have above expressed are, we think, confirmed by other considerations which belong more properly to the next division of this opinion.

2. Error was assigned upon the admission in evidence of the paper propounded, over the objection that there was no sufficient evidence from the subscribing witnesses as to its execution; and also upon admitting the testimony of Mary Gillis as to the execution of the paper by the testatrix and its attestation by the subscribing witnesses, over the objection that she, not being

herself a subscribing witness, was incompetent to testify as to these matters.

It is well settled that the subscribing witnesses to a will must, if practicable, be called and examined; but the fate of a will does not depend entirely upon their testimony.    Upon the trial of an application to prove a will in solemn form, they are, all of them, unless accounted for, indispensably necessary witnesses; but the testimony, even as to the *factum* of execution, is not confined to them.    The fact to be established is the proper execution of the will.    If that is proved by competent testimony, it is sufficient, no matter from what quarter the testimony comes, provided the attesting witnesses are among those who bear testimony, or their absence is explained.    The inquiry, as in other cases, is whether, taking all the testimony together, the fact is duly established.    It is not required that any one or more of the essential facts should be proved by all, or any number, of the attesting witnesses.    The right is simply to have the attesting witnesses examined, no matter what their testimony may be.    The law does not allow proof of the valid execution and attestation of a will to be defeated at the time of probate by the failure of the memory on the part of any of the subscribing witnesses. *Deupree* v. *Deuprce,* 45 *Ga.* 442–443; Jackson v. Le Grange, 10 Am. Dec. 237; Dewey v. Dewey, 1 Met. 349, 35 Am. Dec. 367; Remsen v. Brickerhoff, 37 Am. Dec. 260 (note); Jauncey v. Thorne, 2 Barb. Ch. 40, 45 Am. Dec. 424 and note; Greenough v. Greenough, 11 Pa. St. 489, 51 Am. Dec. 568; Lawyer v. Smith, 8 Mich. 411, 77 Am. Dec. 460; Brown v. Clark, 77 N. Y. 369; Beach on Wills, §39, and cases cited in note 19.    Or, by their even denying their signatures to the will altogether, when such denial is overcome by other competent evidence.    Pearson v. Wightman, 1 Mill, 336, 12 Am. Dec. 636; Matter of Higgins, 94 N. Y. 554; *Hall* v. *Hall,* 18 *Ga.* 45;

*Gardner* v. *Granniss*, 57 *Ga.* 555. In *Deupree* v. *Deupree, supra,* decided in the year 1872, McCay, J., delivering the opinion of the court, said: "There is no question as to the general rule that, on the death of the witnesses, or on the failure of their memory, the proof of the fact of execution begets a presumption that all the details of the fact were such as the law requires." And on page 443, he says: "How many wills do not come up for probate until many years after the execution of them! Sometimes, the witnesses can only recognize their own handwriting; sometimes they only remember the fact that the testator signed, and perhaps only that they signed. Who was present, and all other details, have passed from memory. To say that under such circumstances the will is not to be probated, would be a death-blow to wills." And in Pearson *v.* Wightman, cited above, Cheves, J., said: "Where subscribing witnesses cannot be produced, [or, if found,] they deny their signatures, or otherwise fail to prove the due execution of the will, circumstantial evidence may be adduced to supply this deficiency. . . . It would be of terrible consequence if such evidence were not admissible, for how often and how easily might witnesses be tampered with to deny their own attestation?"

The facts in the case of Pate's Adm'rs *v.* Joe, 3 J. J. Marsh (Ky.), 113, which are sufficiently stated in the case of Jauncey *v.* Thorne, *supra,* are very similar to the facts in the case at bar. In that case, one of the witnesses, a woman, did not write her own name. As the decision says, "She was examined as a witness, several years after the occurrence, but could recollect nothing of the circumstances except that Pate was sick, and rode in their [her and her husband's] wagon, and was left on the road." But her negative evidence was overcome by the affirmative testimony of the other subscribing witnesses, and the court held that the will was duly exe-

cuted and attested. "The most liberal presumptions in favor of the due execution of wills, are sanctioned by courts of justice, where, from lapse of time or otherwise, it might be impossible to give any positive evidence on the subject." Jauncey *v.* Thorne, *supra.* And see Peck *v.* Cary, 27 N. Y. 5, 84 Am. Dec. 220 and note; Higgins *v.* Carlton, 28 Md. 115, 92 Am. Dec. 666.

There is nothing in section 2424 of the code, upon the probate of wills in solemn form, which, rightly construed, conflicts with the law as declared in this opinion. This section does not require that the subscribing witnesses "in existence and within the jurisdiction of the court" shall *each* swear, at the time of probate, to their own subscriptions and to the signature and testamentary capacity of the testator, in order to make a will valid; for thus construing the section would lead to obvious and glaring wrongs and absurdities. It simply means that they must be *produced* for the purpose of testifying to these facts, if competent. This section of the code must be taken, not literally but in accordance with common sense and the usual rules of construction, as was done by this court in *Kitchens* v. *Kitchens,* 39 *Ga.* 171–173, in construing section 2396 of the code then in force, which was the same as section 2431 of the present code. There it is plainly declared that, in the case of a lost will, the copy must be clearly proved by the subscribing witness; yet the court held that while the subscribing witness must prove the execution of the lost will, other witnesses might prove its contents. The main reason of the rule for calling all witnesses in a proceeding for probate in solemn form is, to give the other party an opportunity of cross-examining them; and while the law requires a will to be attested by three witnesses, it does not necessarily mean that all three must concur in their testimony to prove it on probate. To do this would make the validity of the will depend upon

v 96 2

the memory and good faith of the witnesses, and not upon that reasonable proof the law demands in other cases. Nelson *v.* McGiffert, 3 Barb. Ch. 158, 49 Am. Dec. 170, 174 (note); Jesse *v.* Parker's Adm'rs, 6 Grat. 57, 52 Am. Dec. 102; Montgomery *v.* Perkins, 2 Met. 448, 74 Am. Dec. 419.

Section 2424 does not, when considered in connection with the well-established law on the subject of the attestation and proof of wills, as already shown, prevent the probate of a will on account of defect of memory, or even perjury, of a subscribing witness, when the deficiency is supplied by other evidence; because the general rules of evidence, and the force and effect of legal evidence, were not intended to be disregarded in probating wills even in solemn form. This is shown by construing together the act of December 13, 1859 (Acts of 1859, pp. 33–35), and the cases of *Brown* v. *Anderson*, 13 *Ga.* 177, and *Hall* v. *Hall*, 18 *Ga.* 40, from which section 2424 is evidently codified; and by considering the fact that when a will is propounded for proof in solemn form, "the issue, and the only issue, is *devisavit vel non*"—did he devise or not? *Wetter* v. *Habersham*, 60 *Ga.* 194. If each subscribing witness were compelled to testify alike, there might be no issue to pass upon.

3. The only remaining question to be disposed of requires very brief notice. The motion for a new trial complains that the court erred "in not charging the jury the law in regard to mutual wills," and alleges that the verdict is "contrary to the law and evidence in this, to wit: the evidence showed that the will offered for probate was one of several mutual wills, and there was no evidence to show that the other mutual wills were not revoked or destroyed."

Although there was some evidence of an agreement between the testatrix and others to make mutual wills, it does not appear that it was ever insisted upon or car-

ried out, or that the caveators had any concern in it. Moreover, it was incumbent on them to show affirmatively the revocation of the dependent wills, if any there were.   Code, §2397.   So the law of mutual wills was not involved in this case.                 *Judgment affirmed.*