No. 7.—Jemima Hall, caveator, &c. plaintiff in error, *vs.* Sa-
rah Hall, defendant in error.

[1.] By the words *credible* witnesses, in the Statute of Frauds, *competent* wit-
nesses are to be understood; and a will may be pronounced for, though the
attesting witnesses depose to the incapacity of the deceased.

[2.] When explaining the sense in which the term *credible witnesses* is to be
understood, it is not error in the Court, by way of illustration, to say that
the will may be set up by other witnesses, because the subscribing witness-
es "may swear falsely, or may believe more capacity required than is nec-
essary."

[3.] When it appears by the certificate of the subscribing witnesses, and by
their evidence on oath, that a will was attested in the presence of the testa-
tor, this is *prima facie* evidence of the fact, and should be held sufficient,
unless controverted by definite evidence.

[4.] A testator has testamentary capacity, though in a sinking and dying
state, if, when his attention is aroused to the making of his will, his mind
acts definitely, and with discriminating judgment; if he knows the contents
of what is written as his will, comprehends his relations to his family and
connexions, theirs to him, the nature of his estate, and disposes of the same
with understanding and reason.

Caveat on appeal, in Hancock Superior Court.   Tried be-
fore Judge Andrews, October Term, 1854.

This was a question of *devisavit vel non*, upon a paper pro-
pounded as the will of Daniel Hall, deceased.   The *first*
clause gave his wife one half of his real estate; the *second*

gave his cousin Samuel Hall $1.000; the *third* provided that what he gave his wife was during her life, and at her death, to dispose of as she pleased. The next item—"I leave the other part; that is, the remainder, to be equally divided among my nearest relatives." The next was an attestation clause. Then follows, "I mean to be understood my real and personal estate both included in the above disposition of my property; that is, all I possess, in any wise, after the payment of my just debts. I mean by the term I have used above, to-wit: my nearest relatives—my nearest blood relatives. The last item appointed executors. Attested by J. Stone, Hezekiah Rogers and R. F. Green.

On the trial, J. STONE testified, that he was the attending physician, and witnessed the will, about 24 hours before his death. He was importuned by Sarah Hall to go and ask him if he did not want to make a will. Witness asked him, and he said nothing, but appeared careless and indifferent. Then spoke to him of the shortness and uncertainty of life, and told him, if he wanted to make a will, he was ready to write it. After a while he said he had been thinking of making one. I (witness) asked what he wanted written. He said he wanted his wife to have half of his real estate. After I wrote this he went to sleep, apparently in a comitose state. After much difficulty, he said he wanted $1.000 left to his namesake, Samuel Hall. When that was written, he dropped into the same state of stupor. Then said, he wanted his two sisters to have the balance. After the will was written, Sarah Hall requested me to go and ask what he meant by the term real estate. He was in the same state of stupor, and made no answer. I told him it did not comprehend negroes. I asked him again. He still made no answer. He seemed to be trying to understand. I asked him if half of all his estate was what he meant? He answered, "yes, that's what I mean." He seemed, when aroused, to be in his proper mind. I wrote it as he directed, and made the correction as he di-

Hall, caveator, &c. vs. Hall.

rected. Known patients, in comitose state, to be in their right mind when aroused. Sarah Hall was rubbing his head, apparently, to keep him awake, when I asked the first question. She said, " Sammy make your will as you please. Do you want your property you give to your wife to go to your folks or her's at her death ? Would you not rather it should go to your folks ?'' He said, "she has helped me to make the property and save it, and I want her to have one half." She asked him again, and he did not answer. I asked, then, do you want the property, after her death, to go to your folks, or do you want her to do as she pleases ? He said, "That's what I want." She asked him to let her portion include a certain negro. He said "No—let them all go together." I understood her to mean that it should be a component part of her share. There were no other attempts to influence him. His disease was a slow typhoid fever. In the last stages, patients sleep a great deal. Did not converse a great deal with him. No one suggested the name of his cousin. When aroused, he did not use an idle word. His answers to questions were seemingly rational. To test his capacity, I asked him how long he had been sick ? He studied some time and replied, four weeks next Friday. This was right. I read the will to him as I wrote it, by item, but I did not read it over to him as a whole. As I read it, he seemed tacitly to admit it. I do not remember his saying so.

Cross-examination : I was sitting in the parlor when Sarah Hall came to me and said—as Mrs. Hall (the wife) is out, go and see him and try to get him to make a will, if he is not too far gone. She importuned me. I saw no undutiful conduct on the part of his wife. He was sinking, and I was stimulating him with brandy and laudanum. He would never have thought of making a will, probably, had I not suggested it. I do not consider him of sound mind and disposing memory, in the fullest extent of that term. When we ceased putting questions to him he ceased, apparently, to care anything about it. I doubt whether he would have any recollection of the will, had he gotten well. I am not certain

but that when he signed his name, after making the "H" he stopped till he was told the next letter. Doubted whether, in his *palmiest* days, he knew the meaning of *real estate*. When he signed his name, made some observation about its being badly done.

HEZEKIAH ROGERS, another subscribing witness, thought his mind very weak; did not think he was of sufficient mind to make a will. Did not hear the will read, nor hear him say a word at that time; was his overseer; asked him what must be done? Said, "Tell the negroes to wash their faces and hands and go to grubbing the field." We wanted some grubbing done.

R. F. GREEN, the other subscribing witness, did not think him of sufficient mind to make a will. He is the nephew of Mrs. Hall, and lives with her still, and does not know whether she will charge him board.

ANNA DEVEREAUX: Heard Mrs. Hall, a few hours before the will was written, say that Mr. Hall was better, 'that he had been in his senses all the time of his sickness. Testator knew her and spoke to her; when she went in, several neighbors came in and he knew them also. He looked like a dying man—very weak; directed that three witnesses and a Justice of the Peace be sent for, before he signed the will; thought him to be in his sound mind.

MATILDA HALL: Saw testator the day he made his will; thinks he was of sound and disposing mind; knew every one and spoke rationally; heard him tell Dr. Stone that the will was right; she is mother of one of the legatees.

WILLIAM HALL: Present when the will was made; thought him of sound mind; he knew and spoke to witness. Dr. Stone asked him who he wanted as executors? He said his sisters Nancy and Sally. Dr. Stone told him he ought to have a man. He then called witness and asked him if he would be executor. He is father of Samuel H. Hall, a legatee.

E. W. BROWN: Samuel Hall got no property by his wife; he got several negroes from his father. The Court charged

the Jury, among other things, "that the word *credible* witnesses used in the Statute of Frauds, does not mean that all the witnesses are to be believed; but that they are not to be idiots or lunatics, or persons convicted of crime." This charge is assigned as error.

Also, " That a will may be proven and will be valid, though the witness may swear to the incapacity of the testator; that the witnesses may swear falsely, or they may believe more capacity is required than the law holds to be necessary; but if sufficiently proven by other evidence, the will will be set up."

This charge is assigned as error.

A motion was made for a new trial on the ground, among others, that the verdict was against the law and the evidence. The motion was refused, and this is assigned as error.

Other exceptions were filed, but abandoned in this Court.

KENAN; R. M. JOHNSTON, for plaintiff.

L. STEPHENS, for defendant.

*By the Court.*—STARNES, J. delivering the opinion.

[1.] The meaning of the Statute of Frauds, in requiring a will to be attested by three or more *credible witnesses*, according to the charge of the Court below, was not that the same was to be established only by these witnesses, and could not be set up by other testimony, but was, that the witnesses were not to be idiots, lunatics or persons convicted of crime. If this construction be taken in connection with the context, with the whole case, it is not erroneous. The language used in confining the exception to "idiots, lunatics or persons convicted of crime," may have been too restricted; but it was plainly employed by way of illustration. The meaning clearly was, that the word *credible* was used in the sense of *competent;* that the will might be proven, therefore, by testimo-

ny opposed to that of the subscribing witnesses. In this sense, we think the Jury must have understood the charge; and in this sense, it was correct.

We know that there has been some dispute upon this subject; but the better opinion is as we state it.

"A will may be pronounced for though both the attesting witnesses depose to the incapacity of the deceased." *LeBreton vs. Fletcher*, (2 *Hagg.* 558.)

"By *credible* witnesses in the Statute of Frauds, *competent* witnesses are to be understood." *Amory vs. Fellows*, (6 *Mass.* 219.)

[2.] Exception is also taken to the following charge of the Court: "A will may be proven and will be valid though the witnesses may swear to the incapacity of the testator. The witnesses may swear falsely, or they may believe more capacity to be required than the law holds to be necessary. But if sufficiently proven by the evidence, the will should be set up."

It was urged that the Court here put emphasis upon the fact, that the subscribing witnesses might swear falsely, and said nothing as to the possibility of the other witnesses swearing falsely—thus unfairly leaving the Jury to infer that the attesting witnesses in this case had sworn falsely.

It is, to our minds, very plain, that the Court used these words also in illustration. Besides, the proposition was put in the alternative. The witnesses "may swear falsely" he said, or they "may believe more capacity required than the law holds to be necessary." And he referred to these as things, one of which might exist, as a reason why the will should be pronounced for, though the attesting witnesses had sworn to the incapacity of the testator.

We see nothing unfair or improper in the charge, as it is thus presented by the record.

[3.] It was argued, that the Court also erred in not granting a new trial, because the verdict was contrary to evidence, in this: that there was no *legal* presence of the testator, at the time the will was attested by the witnesses; inasmuch as

(it was insisted) he had relapsed into insensibility before the same was signed by them.

This point was not made in the proceedings before the Court below, and does not appear in the assignment of errors. Regularly, therefore, it ought not to be urged before us. But we will deal with it more closely.

The *prima facie* proof is, that this instrument was legally signed by the witnesses in the presence of the testator; for the attesting witnesses so certify by their attestation, and so swear in the evidence which they have given. If this is negatived, it should be by clear and definite contradiction. This does not appear in the record; but resort is had to vague and indirect inference. In consideration of the testimony, as it is presented by the record, the only legitimate inference therefrom, in our opinion, is, that the attestation and signing of the witnesses occurred when the testator had been aroused to consciousness for the purpose of having his will executed.

[4.] We see nothing in the evidence to authorize the conclusion, that the will was obtained by improper importunity, or that the testator was not of disposing mind and memory. Nor can we agree, that what he said on the occasion "sounds in folly." That which may appear unreasonable is susceptible of explanation; and taking all the circumstances into consideration, we think the Jury did what was right in sustaining the will.

Though very ill—though in a sinking and dying condition, yet, it appears to us that what time his attention was aroused and given to the purpose of making his will, his mind acted definitely, and with discriminating judgment. It is clear, that he knew the contents of what was written as his will by Dr. Stone; he showed by what he said and directed, that he comprehended his relative situation to his family and connexions, their relations to him and claims upon him; that before the will was finally executed, his mind acted upon and understood the nature of the estate he was conveying, and that he disposed of the same with understanding and with reason. These are decisive tests of sufficient testamentary capacity.

(6 *Co.* 23, *a.*    4 *Burn. E. L.* 49.    *Herbert vs. Lowns,* 1 *Ch. R.* 24.    *Right vs. Price,* 1 *Doug.* 241.    *March vs. Tyrrell & Harding,* 84.    *Terry vs. Buffington and another,* 11 *Ga.* 337.)

Let the judgment be affirmed.