## SIMPLER *vs.* LORD.

Where the testatrix is aged and infirm in body and mind, and her will is impeached on account of the fraud of her son and principal legatee in its procurement, he ought to produce clear and satisfactory proof of the *bona fides* of his conduct in the matter.

Caveat to will, from Meriwether county. Tried before Judge BULL, at August Term, 1858.

A paper, purporting to be the last will and testament of Elany Simpler, deceased, was propounded for probate before the Ordinary of Meriwether county, by William Simpler, the executor therein named.

William Lord and others, heirs at law of deceased, filed their caveat to said paper writing, propounded as the last will and testament of deceased, upon the following grounds:

1st. Because deceased, at the time of making said pre-

tended will, was not of sound disposing mind and memory, and had not legal capacity to make a will.

2d. Because said pretended will was procured by fraud and undue influence on the part of William Simpler, the principal legatee in and under said will, and the executor thereof.

3rd. Because deceased was prevented by fraud and undue influence from destroying and cancelling said will; and by fraud and deception practiced upon her, by said William Simpler and others, induced to believe that said will was and had been destroyed in her life-time.

The Ordinary, pronounced in favor of the will, and ordered and adjudged that the same be admitted to record and probate ; from which decision caveator appealed.

On the trial, upon the appeal, the following testimony was submitted, viz :

### *Evidence for Propounder.*

*Aaron Sibly*—proved that he was one of the subscribing witnesses—saw deceased sign the same, and the other witnesses—does not think she was of sound mind—she was quite old and feeble—some seventy or eighty years of age—has known her for several years—the will was executed at the house of deceased, and at the time it bears date.

*Cross-Examined.*—William Simpler came for witness to go and attest the will. Witness was unwilling to go— Simpler urged him to go—proposed to pay him if he would go—said he was going to get the advantage in the will, and wanted it executed then. A day or two before this, Simpler asked him, witness, to write a will for his mother, she not being present, which witness declined to do, for the reason that he did not think she was capable of making a will. Simpler then asked witness if he had a form book—told him he had and furnished him with one, from which he drew up a will for his mother. [Wit-

ness was here handed a paper, and he was asked if that was the paper which propounder drew up as his mother's will from the book.] Witness said this was the paper— that it was in propounder's hand writing, and was brought by him to his mother, where the will was executed—the will signed by deceased was copied from the paper written by propounder, with some slight alterations in the names of some of the legatees and small legacies, upon witness suggestion that all the legatees must be named or the will would not be good. The recollection of witness is, that the paper drawn by propounder was read over, but it was not the one signed by deceased. Dr. Fambrough wrote the will and copied it substantially from the paper fur- nished by propounder. The will was handed to witness to keep, after it was executed. Propounder was managing his mother's affairs as her guardian at the time—has heard him say that she did not have capacity to manage her own affairs. About twelve months after the will was executed, Valentine Simpler, (a son of deceased,) called upon witness one Sunday, on his return from church, and said his mother had sent him for her will, which witness declined giving to him—told him that it was not a proper day to attend to such business. Shortly after this he saw propounder and told him that the old lady had sent for her will—propounder told witness that if she sent for it again, to send her the paper from which the will was copied, (already identified.) After folding it in an envel- ope, and sealing it up, and requesting witness to endorse on it, "Mrs. Elany Simpler's 2nd last Will and Testa- ment"—this paper was left with witness, with directions to be sent to his mother. In a short time, Mrs. Simpler sent to witness again for her will, and he sent her the paper enveloped and endorsed as above. She never sent afterwards for the will—it was taken out of his hands by propounder and placed in the hands of Dr. Fambrough, as he has been informed. Witness is a justice of the

Simpler vs. Lord.

peace—had no other motive in sending the copy will than to comply with the request of the propounder, who was a neighbor.   Has said, and so thinks, that Valentine, although called an idiot, has as much sense as many of the other children.

*Isaac C. Bell*—was present when the will was executed —signed it as a subscribing witness, and saw deceased sign it.   She did so freely and voluntarily—thinks she was of sound disposing mind—has known her several years—thinks she had a strong mind for a woman of her age.   Says positively, that there was no paper there from which the will was copied, brought by Simpler or any other person—the will was dictated by the old lady herself, and was written by Dr. Fambrough, and read over to her after it was written.

*Cross-Examined.*—Says positively, there was no paper there at the time the will was written from which it was copied.   In April, 1857, deceased told witness that she had no will, and requested him to write to L. M. Adams, Esquire, to come and write her a will.   Witness wrote to Adams.   At this time witness did not consider the old lady in her proper mind, and not capable of making a will.   She requested witness to convey a message to the church, requesting its prayers in her behalf, which he did —conversed with her freely at the time—thought her rational—thinks the last conversation was subsequent to the date of the note he wrote to Adams.   Dr. Fambrough is witness' son-in-law.   William Simpler came after witness to witness the will.   Witness suggested to the old lady that she ought to give her daughter Beersheba something, which she did.

*John S. Rayland*, a subscribing witness, swears that he thought deceased was of sound mind at the time—has known her several years—saw no paper from which the will was copied—they were writing the will when witness got there—stayed in the house but a short time.   William

Simpler came after him, and has heard him say that his mother had not capacity to manage her own affairs.

*Wm. A. Fambrough* testified that he was a subscribing witness—was sent for, and signed the will at the request of deceased—thought she was of sound and disposing mind and memory at the time she executed it—thinks she signed it voluntarily and freely.   She charged witness to keep the whole matter secret—her reasons were that if the other children found out that she had made a will, they would trouble her as they once before did.   Witness wrote the will—when he got there she or they had a will, or copy of a will that did not suit her fully, and she said she would rather have another written, and the company, or witnesses, requested witness to write it for her.   Witness conversed with her during the time—considered her mind strong for a woman of her age.

*Cross-Examined.*—William Simpler notified him that his mother wanted to make her will, and requested witness to go to her house—the will was executed at her house. He wrote the will and used a paper furnished by some one, (but don't know by whom,) for a form ; thinks the paper shown to him was very near like it—don't know that it is—had no papers before him except the one referred to—don't know whose hand-writing it was—thinks it likely that it was in propounders hand-writing, but cannot say positively.   Witness' impression is, that William Simpler said he had written it or had it prepared.   Will not say that William Simpler handed him the paper from which he copied the will.   The will was given to Esquire Sibly, after it was executed, to keep—William Simpler was present—they did not live together.

The paper then propounded wss offered and read in evidence—it bears date, 14th May, 1855.

### Evidence for Caveators.

*Nancy F. Crosson*, testified that she has often heard Mrs.

Simpler say that she was in trouble about her affairs—that her great trouble was, that she wanted a will so a to leave her poor idiot children something, and not suffer for want of attention. The last time she recollects was in the spring of 1857. Mrs. Simpler said if she should die and not leave a will, her son William would cheat them out of all that they had, and they would come to want, for Nancy would not live three weeks after she was gone. She stated that she wanted Ann Ellis to take care of Nancy, and for her to have Noah and Mary, and Valentine to have John and the place where she lived. She said that William Simpler and wife should not have the care of her poor idiot children, for she would not let dog be in their care, much less her children. Mrs. Simplers' mind was as good as it had been for some years past. She had no confidence in her son William, for he would say one thing and do another. Witness said that William appeared to be friendly, but Mrs. Simpler had no confidence in him, and did not think so.

*Cross-Examined.*—She had a number of conversations with Mrs. Simpler in the years 1856 and 1857. Witness is, and always has been, friendly with William Simpler and his wife—is not a relation of deceased—visited her as a neighbor—knows nothing about the quarrel of Valentine and William Simpler.

*Jane H. Howard,* says, in substance, that she has heard Mrs. Simpler say that she wanted a will—cannot say how often, but many times. In the spring of 1856, she first began to talk about her will, so on to 1857, and appeared to be very much troubled about it, and all, or most of her trouble was about her two idiot children, and she had no friend in the world to help her—she said if she could have one friend she would be glad—that Isaac C. Bell had promised to send to Esquire Adams and have a will written for her—had never done so—she believed he had joined William Simpler against her—said she had no will

and wanted Ann Ellis to have Nancy and take care of her, and she wanted Nancy to have Noah and Mary, and Valentine to have the place and John—this was in the spring of 1857—as for William Simpler and wife, they would be too fine to take care of my poor children—they should not take care of a dog of hers, much less her poor idiot children—that William's wife called her a lunatic— said she told her she would have sense enough not to let her have all—that she should not have all her property, or what she had worked for—said she had no confidence in her son William—that he was doing all he could against her.

*Cross-Examined.*—Cannot say how many times, nor how often she has had conversations with Mrs. Simpler—has always been friendly with William Simpler and his wife —supposed at the time Mrs. Simpler had no will, for she stated so to witness—never tried to get her to make a will in favor of witness—is not a relative—went to see her as a neighbor.

*Seth Williams* has known Mrs. Simpler for a number of years—lived neighbor to her. Sometimes she would appear rational, and at other times she would not have any sense at all—has heard William Simpler say she was entirely incapable of managing her own affairs—visited the old lady frequently, and regrets to say that William Simpler neglected his mother—did not give her the attention she needed—she complained that he did not furnish her enough to eat, &c. William Simpler's wife was generally there, but he was not. Some years ago when the old lady's health was good, he witnessed a will for her, in which she disposed of her property nearly equal among all her children, except Valentine and Nancy—thinks she gave them somewhat the most and left their share in the care of William Simpler.

*Mr. Howard* says, that in the spring of 1857, deceased requested him to write a letter to her daughter, Ann

Ellis, who lived in Alabama, to come in and see her, as she was very much troubled about her property, and wanted to make some disposition of it—complained of William's treatment towards her—said she had lost all confidence in him, and requested witness to write to Ann Ellis, not to direct her letter to her, if she did William Simpler or William Lord would get it out of the post-office and she would never get it; to direct her letter to the witness—wrote the letter as requested and sent it by mail.

*T. B. Godfrey* says that he was well acquainted with deceased—has known her for several years—lived neighbor to her—does not think she has been capable of making a will for the last ten years—was very old, infirm and deranged—has heard William Simpler say she was entirely incapable of managing her own affairs, and that he was managing them for her, as her guardian.

*Dr. Chatfield*, for propounder, testified that in the spring of 1855, he and Dr. Reese were requested by William Simpler to walk up to Mr. Grant's law office, in Greenville, and examine the condition of his mother's mind in relation to some proceedings in court to restore to his mother her property, as he stated. Witness examined her and thought her mind sound at that time; as much so as most people of her age and feeble condition. Does not recollect whether this was before or after the date of the will.

The jury found the paper propounded to be no will.

Propounder moved for a new trial on the following grounds:

1st. That the verdict was contrary to evidence and the weight of evidence.

2nd. That the verdict was contrary to law.

3rd. That the verdict is contrary to both law and evidence.

The court overruled the motion for a new trial and propounder excepted.

B. H. HILL, and ADAMS & KNIGHT, for plaintiff in error.

HIRAM WARNER, *contra.*

*By the Court.*—LUMPKIN, J., delivering the opinion.

The caveat to the will of Mrs. Simpler is put upon two grounds, to-wit: incapacity to make a will, and fraud on the part of William Simpler, her son and principal legatee in the procurement of it.

The jury pronounced against the will. The circuit judge refused to grant a new trial; and the court is called on to reverse the judgment, notwithstanding it is conceded that the facts of the case were fairly submitted, under the law, to the jury.

To justify us in overruling the judgment, the case should be a strong one.

Upon the question of insanity, we might admit, perhaps, that the preponderance of proof is against the verdict. There is very stubborn testimony, however, in support of it. It is disputed and doubtful, whether the will was read over to the testatrix at the time of its execution. And that it was written from any instructions by her, there is no pretence whatever, although it may be in conformity to her long cherished intentions.

As to the second ground of caveat, the fraud of William Simpler in procuring the will, the weight of evidence is in favor of, and not against the verdict; and instead of producing the most satisfactory proof as to the *bona fides* of his conduct, as he was bound to do, considering the condition of his mother, and the large interest he took under the will, there is the utter absence of explanatory testimony to remove the cloud which overhangs this transaction. There is much of art and contrivance disclosed

in the record; and no one can doubt but that the old lady died, believing that she had no will, and who but her son, was the author and contriver of this mistake and delusion?

Judgment affirmed.