Anderson, J.
In view of the importance of this cause, the court has given to its consideration the most careful and earnest attention. And if we have erred in our conclusions, no fault is attributable to the learned counsel on either side, who have conducted the discussion with scrupulous fidelity to their respective clients, and with great research and distinguished ability. .
It is not surprising that the mere announcement, *174 that the decedent had given the bulk of his large estate to his attorney, who was the writer of his will, and a stranger to his blood, to the exclusion of his lawful kindred, should have excited comment in the country. And the fact, that the writer of the will was an eminent member of the profession, and had filled various posts of honor and high distinction in the service of his country, would naturally cause painful reflections in the public mind, and especially amongst the members of a profession which is so closely connected with the administration of justice, and who, in general, have been keenly sensitive, and justly so, to anything which might bring reproach or stain upon their fair and honorable escutcheon.
By the civil law, if a person wrote a will in his own favor, it was rendered void. I am not prepared to say that such a provision in our law would not be consonant with public policy, and a safeguard to public morals, especially when the writer of the will was the attorney of the testator. Not that such a disposition of his estate might not fairly be made by a testator, and that he .might not justly regard, his attorney his best friend, and the most worthy object of his benefaction, and bequeath his property to him free from all restraint and undue influence; but considering the relation of confidence between the client and his attorney, and the capacity which a venal and unscrupulous attorney would have to abuse that confidence, and considering the infirmity of human nature, which requires from the best of men the daily prayer, “ lead us not into temptation,” and the relation of the legal profession to the pure and faithful administration of the laws, and the importance of its occupying a position which raises it above suspicion, it is argued with much force, that an attorney should be absolutely *175 incapable of taking a benefaction from bis client by gift inter vivos or by will.
On the other hand it may be argued that by the law of England and America, the testator has the right, as he ought to have, to bestow his property on whom he will. He has the right to select the objects of his bounty. That his attorney may be the best friend he has in the world and the most worthy object of his benefaction; and if he has capacity to make a will, and freely and of choice desires to bequeath his estate to him, he ought not to be deprived of that privilege. Whether this be a just conclusion as to what the law' should be, or whether it is best that the rule of the civil law should prevail, I think the current of decisions shows that it has not been adopted to its full extent as a rule in England or America.
In England it has not, and is distinctly so declared. (1 Williams on Ex’ors, 4 Amer., from last London edition, p. 91.) And the writer adds: “The act is not absolutely void, even though the person making the will in his own favor is the agent or attorney of the testator;” but the suspicion thereby is, for obvious reasons, greatly increased.
In Billinghurst v. Vickers, 1 Phill. R. 187, it is held that the act is not actually defeated, as it was by the civil law. To the same effect are Paske v. Ollatt, 2 Phill. R. 328; Barry v. Butlin, 1 Curteis R. 637; Baker v. Batt, 2 Moore P. C. C. 317; Hitchins v. Wood, Ibid 855, 436. The same is held in the American cases. A will by a client in favor of an attorney is not absolutely invalid. The existence of that fiduciary relation does not annul the act. Wilson v. Moran, 3 Bradf. R. 172. To the same effect is Crispell v. Dubois, 4 Barb. Sup. C. R. 393; Cramer v. Cruinbaugh, 3 Maryl. R. 491; Watterson v. Watterson, 1 Head’s (Tennessee) R. *176 1; Adair v. Adair, 30 Georgia R. 104; Nexsen v. Nexsen, 3 27. York Court of Appeals decision 360; Good-acre Taylor v. Smith, 1 Law R. Probate and Div. 359. In Coffin v. Coffin, 23 27. York R. 9, Comstock C. J. said: “ It is not a rule, or a principle of tbe law of testaments, that the draftsman of a will cannot be an executor, or take a benefit under it.
The counsel for appellants rely on Meek & Thornton,, ex’ors v. Perry wife, 36 Miss. R. 256, and Garvin’s adm’r v. Williams al., 44 Missouri R. 465, as maintaining the rule of the civil law. Though the reasoning of the judges may tend in that direction, the decision in neither case goes to that extent. They do not hold that the will is absolutely void, but only that the relation of confidence raises a prima facie presumption of undue influence, which, unless rebutted, the-will cannot stand.
The Mississippi case turned upon an instruction given by the court of trial to the jury in the following-words, to wit: “That the law watches with jealousy transactions between guardian and ward; and if the jury believe that Louisa McKinnie (the ward) made a will in favor of her guardian whilst the relation of guardian and ward subsisted, the circumstances must demonstrate full deliberation on the part of the ward, and abundant good faith on the part of the guardian,, or they must find against the will. The appellate court held that there was no error in the instruction.
The Missouri case also turned upon an instruction, which reciting all the facts in the ease, asked the court to declare, that “the presumption arising from such fact is, that the alleged will was procured by the undue influence of J. P. Williams; and that presumption can only be repelled by satisfactory proof that no undue influence was used to procure the same.”
*177 The appellate court held, that under the circumstances in which the will was made, it was presumptively invalid, and the burden of proving its validity rested upon those'who sought to derive an advantage under it. The instruction, therefore, which was refused by the court should have been given. It is clear that in neither of the foregoing cases was it held, that on the ground of the relation of confidence between the testator and the legatee the will was absolutely void, but only presumptively so, which presumption it was competent for the propounder of the will to repel. And in this last case it will be observed that there was much in the conduct of Williams, besides the confidential relation, from which the presumption against the validity of the will might arise. But in these cases the doctrines enunciated are not entirely conformable to the rules which have been adopted ana. established by the current of English and American decisions.
These rules as laid down by Baron Parke in Barry v. Butlin, 1 Curt. Ecc. R. 637, are, first, “That the onus probandi lies in every case upon the party propounding a will; and he must satisfy the conscience of the court that the instrument so propounded is the last will of a free and capable testator;” and second, “that if a party writes or prepares a will under which he takes a benefit, that is a circumstance which ought generally to excite the suspicion of the court, and calls upon it to be vigilantand zealous in examining the evidence in support of the instrument; in favor of which it ought not to pronounce unless the suspicion is removed, and it is judicially satisfied that the paper propounded does express the true will of the deceased.” These rules are approved by the court in Crispell v. Dubois, 4 Barb. Sup. C. R. 393; also in Cramer v. Cruinbaugh, 3 Maryl. R., supra.
*178 In Wilson v. Moran, 3 Bradf., supra, the court says : “True, it is held that where the legatee who stands in a confidential relation to the testator, himself draws the will, this circumstance calls for increased vigilance on the part of the court in ascertaining the validity of the will. But in such cases, the most that has been, or ought to be required, is satisfactory evidence that the testator was of sound mind, and clearly understood the contents of the will, and was at the time under no restraint. hTo case has gone so far as to overthrow a will duly executed when it was shown that the party executing it was of- sound mind, and clearly understood its contents, though it was drawn by the person taking the estate.”
It seems to me that the rules and principles by which cases of this nature should be decided are clearly and correctly stated in the foregoing decisions, and they are sustained by the almost unbroken current of English and American authority. Let us now apply them to the case in hand.
In the first place, I cannot doubt, upon the evidence •in this record, that John H. Johnson was capable of making a will on the 18th day of February, 1867, when this will was executed, and also when he executed the codicil on the 17th of June following. The three subscribing witnesses, who are regarded in law as placed around the testator that no fraud may be practiced on him in the execution of the will, and to ascertain and judge of his capacity, all of whom are represented to be men of intelligence and respectability, were not only of that opinion, (and the law makes their opinion evidence,) but facts are proved by them and others, which, in connection with the intrinsic evidence furnished by the instrument itself, excludes all doubt that the testator was of sound disposing mind.
*179 In the next place we will inquire, had he knowledge of the contents of the codicil when he signed it? Being capable of making a will, it is not probable that he would have signed it without knowing what it contained. But the proof is positive and direct. It is proved that the testator himself gave instructions to Mr. Bocock, which were written down by him and afterwards read over several times to the testator and approved by him. The codicil was then written, and Mr. Pankey and Mr. Agee, who together with Mr. Thornhill had attested the will, and who the testator desired should attest the codicil, were sent for, and one of them, Mr. Pankey, who had been a justice of the peace for a number of years, read it to him. The testator said he heard it and well understood it. That he had heard it several times before, and that it was written as he directed.
The proof is that “ the . codicil,” after it had been written out, had not been before read to the testator, although the note of instructions had. The fair inference from the testator’s remark, that he had heard it several times before, is, that there was no discrepancy between the note of instructions and the codicil. And Mr. Thornhill testifies that u all was read to Mr. Johnson in the notes,” and “ all was in the notes as it is in the codicil.” These two things being established, first, that the testator was capable, and secondly, that he had knowledge of the contents of the instrument, and the execution having been according to the requirements of law, ordinarily, further proof would be unnecessary to establish the will. But this case being of the class which calls upon the court to be vigilant and jealous in examining the evidence, and to be satisfied that the paper propounded does express the true will of the deceased, which satisfaction cannot be felt *180 whilst suspicion rests upon it, we will further inquire, was the testator under restraint when he executed this codicil ?
A valid testamentary disposition of property must be the voluntary act of a capable testator. In Wilson v. Moran, supra, the court said: “A will by a client in favor of an attorney is not absolutely invalid. The existence of that fiduciary relation does not annul the act; but still the circumstances call for unusual vigilance, to see that it was in consonance with the views- and wishes of the testator.” Baron Parke affirms in Barry v. Butlin, 1 Curt. R. 687, that all that can be truly said is, that if a person, whether attorney or not, prepares a will with a legacy to himself, it is at most a suspicious circumstance of more or less weight according to the facts of each particular case; in some, of no weight at all, varying according to the circumstances; for instance, the quantum of the legacy, and the proportion it bears to the property disposed of, and numerous other contingencies; but in no case amounting to more than a circumstance of suspicion demanding the vigilant care and circumspection of the court in investigating the case, and cálling upon it not to grant probate without full and entire satisfaction that the instrument did express the real intentions of the deceased.
The quantum of the legacy and the proportion it bears to the property disposed of, according to this authority, is unfavorable to this will. But it is still only a circumstance of suspicion, which calls for vigilant care and circumspection. The turning point is, does the instrument express the real intentions of the deceased? The same principle is sanctioned and acted on in Baker v. Bott, 2 Moore P. P. C. 317. And in the subsequent case of Purling v. Loveland, 2 Curt. R. *181 225, 227, Sir H. Jenner Fust, referring to these passages in the judgment of Baron Parke, said, he acceded to every one of the doctrines and principles there laid down, but was not aware that the prerogative court had ever acted on any other or different. And they are recited by Judge Lomax in his book on executors, without dissent.
hfo presumption can be raised against the will or codicil in this case, from the fact that a stranger is preferred to his lawful kindred, when the facts certified in the record • are examined. The relation was one of hostility; and the testator had long before formed the fixed and inflexible purpose that his relations should have no part of his estate; which purpose it does not appear that he ever abandoned to the day of his death, though he thought at one time of making a small legacy to each of two sisters. By the will which was written for him in 1859 by his attorney, Mr. William M. Cabell, he left them nothing.
The evidence also clearly shows that he gives his illegitimate children all that he intended them to have. On whom then could he bestow the residuum of his estate? Mr. Cabell testifies that his feelings toward Thomas Bocock were very partial. And it is also in proof that he said he intended to help him as he had been inj ured by the war, and was a public man, and had been disfranchised. Being unwilling to do more for his illegitimate children, and not willing that his relations should have any part of his estate, who was there, that he would have been more inclined to make his residuary legatee than Thomas Bocock.
The’ provisions of the codicil were known by his children and relations, and by all who felt any interest. There was nothing clandestine in the transaction. ISTo attempt was made to exclude any one from the testa *182 tor’s person, or to conceal the dispositions he had made-of his property. The will was not only ambulatory, - revocable, or alterable, at the pleasure of the testator, from the 17th of June, when the codicil was executed, until the day of his death, the 10th of July, but the disposition in favor of Bocoek could be changed simply by the testator giving orders on him. During this period the testator’s relations and illegitimate children might have free access to him. The woman who waited on him and nursed him, his reputed wife, as well as his natural children, had every opportunity to bring what influence they could to bear upon him to change his will as to Boeock. Some of his children and one or two of his sisters availed themselves of this opportunity to approach him and to persuade him to change his will. But in vain. He was inflexible. He would not even do more for Martha, his reputed wife,, though advised to it by his executor. All the evidence represents him as a man of strong mind and inflexible will. His sisters succeeded in disturbing his mind by' representing that he had given all his bonds and chosesin action to Mr. Boeock absolutely; and he expressed a desire to have some change made in that clause of his codicil. But the letter from Mr. Bocoek satisfied him that it was all right, and that its provisions were just as he had directed and desired them to be. That letter represents the state of the case truthfully, and informs Mr. Johnson that he may revoke his codicil altogether, or may alter it either by executing a new codicil, or by giving orders on him, and actually sends him formulas, by which the testator can take every dollar from him and give it to whom he will. It is objected, that Mr. Bocoek makes the order payable to the testator’s “ relations,” knowing that he was averse-utterly to giving them anything. But he tells him in *183 his letter that Mr. Thornhill can make any changes he may wish in those formulas. If Mr. Bocock inserted “ relations” in the formulas, to intimate not that he should, but that he should not, make a disposition in favor of his relations, he does nothing to guard against his making a provision in favor of his illegitimate children.
It was also urged in argument, in this connection, that Mr. Bocock ought to have gone to see Mr. Johnson in order to aid him in the preparation of any papers he might wish to have prepared in relation to the disposition of his bonds and other charges on the money to be collected on them. If he kept away from Mr. Johnson to prevent him changing his codicil, or from drawing orders on him in favor of other parties, such conduct would deserve the severest censure and reprobation, and might be treated as a fraud upon those in whose favor the change was contemplated, though even such conduct could not effect a revocation of a will which had been duly executed, or defeat the probate thereof. Though the fact, if it were so, could not affect the issue involved in this suit, justice impels me to say that, in my opinion, such an inference cannot be fairly drawn from the facts appearing in this record. Mr. Bocock by his letter had plainly informed Mr. Johnson of all that was necessary- to enable him to change the disposition of his bonds, &c., which he had made in his codicil, and informed him of his perfect right to make any change he thought proper, and to give the property to whomsoever he chose, and furnished him with the proper form of an order on him to effect such change, which he informed him he would respect: Thus giving him all the information he needed, and every facility to make the change which he could have afforded him if he had been personally *184 present. It is not fair to presume that he had staid away to prevent him doing what he had already given him every facility for doing, especially when a better motive can be assigned, and with better reason for his conduct.
Mr. Bocock was aware that it was in the power of Mr. Johnson to change his will at pleasure as long as he lived, and retained testamentary capacity, and that the bequest to him was conditional, and that it was in the power of Mr. Johnson to render it valueless simply by giving orders on him, and that Mr. Johnson was aware of it. He knew also that the disposition which he had made in his favor was known to his illegitimate children, and he had reason to believe would be made public; and that the numerous persons who would feel that they were interested to defeat it, would have unrestrained access to Johnson, and would probably bring every influence they could against him. Yet it does not appear that he did anything to guard against these influences. He did not keep the disposition made in his favor concealed from Johnson’s family, which would have been the most effectual, nor did he against those influences speak a word to Mr. Johnson by way of caution, or to restrain him from giving orders on him; but, on the contrary, told him that he would accept his orders payable when the money was collected, and which would be good after his death; and when he. was informed by Mr. Thornhill that influences were brought to bear on the mind of Mr. Johnson to induce him to change this clause in his codicil, be wrote to him informing him that he had a perfect right to do so, and that his wishes should be carried out by him; and he furnished him with every facility he could to make any disposition he thought proper of the funds which were in his hands. In the conclusion of his let *185 ter he says: “As soon as my business is through I will be down;” but he never went to Mr. Johnson’s liouse until after his death. He had a right to presume that after Mr. Johnson received his communications, if he wanted him he would let him know. He had given him all the legal advice and assistance by letter that he could if he were present. He preferred not to engage in a contest for a bequest of Mr. Johnson’s property. He was willing to accept what he freely bequeathed him, but he was not willing to engage in a contest with the relations or with the illegitimate children for it. He chose therefore to surrender to them the whole field and to abide the result, without exposing himself to the imputation of going there to exert a personal influence over Mr. Johnson, to the prejudice of his blood relations and illegitimate children.
It has been held that a person may by fair argument and persuasion induce one to make a will in his favor. Jarman on Wills p. 38-’9, and cases cited. And it is said by Mr. Perkins, in the 4th American edition of Jarman on Wills, to be the result of the cases, that “ the influence to vitiate an act must amount to force and coercion, destroying free agency. It must not be the influence of affection and attachment, it must not be the mere desire for gratifying the wishes of another; for that would be a very strong ground in support of a testamentary act.” Jarman on Wills 40, 41. Whether this be true or not, there is not an item of evidence in the record to show that Mr. Bocock, by any sort of intimidation or persuasion, influenced the testator to give him a benefit under his will, or that he even intimated a wish that he would do so. It is a fair presumption from the evidence, that the first intimation that he had ever had that the *186 testator intended to make a testamentary disposition in his favor, was whilst he was engaged in taking a note of his instructions. And the intimation seems to have taken him by surprise. The testimony of Albert and Washington, reputed sons of the testator, who say they were present, or in hearing, when the instructions were given, and when the codicil was executed, is positive and unequivocal, to the effect that the dispositions made in the codicil were dictated and suggested by Johnson, and originated in his mind, and were written by Bocock according to his instructions, and fully corroborates the testimony of Thorn-hill.
If there was any sort of influence exerted by Mr. Bocock, to induce Mr. Johnson to give him so large a part, or any part of his estate, it does not appear in this record. On the contrary, the conclusion from the evidence, it seems to me, is irresistible, that the codicil expresses the real intentions of the testator, which were the suggestions of his own mind, and that it is the result of his free and unrestrained volition.
With regard to the question raised as to the competency of Albert Thornhill to testify in the cause, we think there is no error in the ruling of the Circuit court. By express statute, he is not incompetent by reason of his being executor: and it does not appear that he had any such interest in the establishment of the codicil as would disqualify him as a subscribing witness. As to the ruling with regard to the competency of James H. Gooding, the joint deed of his wife and' himself releasing her interest in the estate of Johnson, if she had an interest in that estate, which would render her husband incompetent, it was thereby extinguished; and if she had not, no release was necessary to remove incompetency on that ground.
*187 But they were plaintiffs in the suit, and liable for costs. The rule which excludes a party to the record as a witness in the cause applies to all cases where the party has any interest at stake in the suit, although it be only a liability for costs, and excludes a prochein ami, &c. Murphy's adm'or al. v. Carter & al., 23 Gratt. 485. The deposition of the wife of a proehein ami cannot be read, as he is liable for costs. If one is incompetent to testify, the other is also. Chapter 172, § 21, 22, Code of 1873, rendering parties to civil suits competent to testify in their own behalf, by express terms does not apply to husband and wife. There is no error, therefore, we think, in the ruling of the Circuit court, in excluding the testimony of James H. Gooding. Upon the whole, I am of opinion that there is no error in the decree of the Circuit court, and that it should be affirmed.
The other judges concurred in the opinion of Anderson J.
Decree aeeirmed.