L. Q. C. THOMPSON, next friend, *et al.*, plaintiffs in error, *vs.* JACOB S. DAVITTE *et al.*, executors, defendants in error.

1. The ultimate question for the jury, on the trial of an issue of *devisavit vel non* is, whether the instrument propounded is or is not the last will and testament of the deceased.
2. A *prima facie* case in favor of the will being made, the burden of proving the fraud or undue influence alleged is upon the caveators.
3. Undue influence or fraud, to invalidate the will, must amount to force or fear—must, in effect, make the will the mental offspring of some other person; and must be operative on the mind of the testator at the time the will is executed.
4. Inequality among children in the provisions of the will, may be considered in deciding upon the existence of undue influence or fraud, as well as upon whether the testator acted under such influence or fraud in making the will. The inequality, like other per-

tinent facts, may be regarded throughout the whole scope of the inquiry.

5. What is an unnatural will, because of inequality among members of the testator's family, is a question of fact, not of law.

6. Though a son of the testator be a principal legatee, whether the son ought to produce clear and satisfactory evidence of the *bona fides* of his own conduct, depends upon whether, according to the facts proved, his conduct was suspicious.

7. There is no invariable presumption of law that evidence is true because a party does not rebut it when in his power. Nor is a party to the cause bound to offer himself as a witness at the peril of having everything taken against him which he might, as a witness, contradict.

8. When the testator, who could read and write, produced a will already signed, declared it to be his will, and requested three witnesses to attest it, and they did so, this was an acknowledgment of the whole instrument, the signature included.

9. The writing propounded as a will, if testamentary in its character and regular on its face, should be submitted to the jury in connection with the testimony of the subscribing witnesses.

10. There need be no peculiarity in the mark of an attesting witness, provided he can swear to it when called to testify.

11. The word will being ambiguous, it is not true that a man cannot make a will against his will. He may force desire to bend to duty in a testamentary act as well as in any other act.

12. Identity being matter of opinion, a subscribing witness who is illiterate may give his opinion that the paper produced is the identical will which he attested.

13. In swearing to his mark, the witness may state his belief, though he cannot be positive. The answer may be something broader than the interrogatory, and still be admissible.

14. The answer of an attesting witness, that, "from the best of his knowledge and belief, the testator did not make the will freely and voluntarily," was properly excluded.

15. Though the charge of the court was not free from error, the verdict was correct and ought to stand.

Wills. Caveat. Fraud. Undue influence. Evidence. Witness. Attestation. Opinion. Before Judge UNDER-WOOD. Polk Superior Court. February Term, 1877.

Sufficiently reported in the opinion.

E. N. BROYLES; WARREN AKIN; TIDWELL & THOMPSON, for plaintiffs in error.

WRIGHT & FEATHERSTON, for defendants.

BLECKLEY, Judge.

The will of John C. Davitte was propounded for probate in solemn form. Some of the heirs at law entered their *caveat*, the grounds of which were, that the testator was not of sound disposing mind and memory; that he did not execute freely and voluntarily, but from undue influence and persuasion, and from the over-importunity of the principal legatees, and to obtain quiet and repose; that the instrument is not attested by three or more witnesses, but by two only; that it was not attested and subscribed by the witnesses in the presence of the testator; that it was not signed by the testator in the presence of the witnesses, nor acknowledged before them to be his will; that it was made (if at all) under a mistaken supposition by the testator that he had previously advanced to his other children an amount of property equal to that devised to each of his two sons who are, by the will, his principal legatees, his intention having been to give all his children equal shares, and his mistake being caused by his infirmity and the misrepresentation of these two sons; and that his mind was weak and imbecile, and that fraudulent practices were employed by interested persons to induce him to make the will. By appeal, the case passed from the court of ordinary to the superior court. On the trial, the jury found in favor of the propounders, and set up the will. The *caveators* moved for a new trial on many grounds, all of which were overruled. Such of them as were specially insisted upon in this court, will now pass under review. Their number, if not their difficulty, will require some time and space.

1. The court charged the jury: "The real question for you to decide is this: is the paper propounded and offered in evidence, proven as the law requires to be the will of John C. Davitte, or is it not so proven?" Other parts of the charge were such as that the jury could not have under-

stood this to mean that there was nothing for decision but the *factum* of the will—the mere requisites of formal execution. Besides, to prove a contested will as the law requires, is to establish all that is needful to set up the instrument as a real, valid will. We are to presume that the court informed the jury what the requirements of the law to which he referred were, and that the jury had all the light which they needed on that subject.

2. Another part of the charge complained of is: "Where fraud or undue influence is alleged, in the procurement of the will, the burden of proof is upon the *caveators* to prove such fraud or undue influence." The full charge is not set out in the record. For aught that appears, the court may have previously defined what it took to constitute a *prima facie* case on the part of the propounders. If that was done, the clause above quoted would then have been appropriate. The Code declares, in section 3759, that: "What amount of evidence will change the *onus* or burden of proof, is a question to be decided in each case by the sound discretion of the court." Adverting to the brief of evidence contained in the record, we have no doubt that the propounders did prove enough to change the *onus*, and that, as the case stood when the charge was delivered, the burden was upon the propounders to make good their allegations. According to what is said by the court in *Evans vs. Arnold*, 52 *Ga.*, 169, the charge in that case was to the effect that after the *factum* of the will was duly proven, the burden of showing the other requisites ceased as to the propounders. That feature is not presented here. How much besides the *factum* of the will was held requisite, is nowhere made known to us, nor is it said or intimated that nothing further was exacted of the propounders. The truth is, that what the propounders have to carry, on the score of sanity and freedom, is more in the nature of ballast than of cargo. It is just burden enough to sail with—no more.

3. The court charged the jury "that, in order to set aside a will on the ground of fraud or undue influence, such fraud

or undue influence must amount to force or fear, and in
effect make it the will *not* of the testator, but of some other
person; and the question is as to the time when the will.
was executed : was the testator, at the time he executed the
will, under the control or fear of another? If he was not,
the will ought to stand, even if he had been before or after
that time under the fear or influence of another." The evi-
dence discloses no fraud as distinguished from undue influ-
ence—no mere trick or deception. If it did, the expres-
sions in this charge as to force might not, and perhaps would
not, be appropriate. See 11 *Ga.,* 343. On the extent to
which undue influence must go in the destruction of free
agency, the positions of the charge are supported by 21 *Ib.,*
552. The meaning is, that there must be mental constraint,
moral coercion, the substitution of external for internal
agency. 6 *Ib.,* 325. That the influence must be operative
at the very time the will is executed, there can be no doubt.
1 Red. on Wills, 516. Though, to ascertain whether it was
so or not, the state of things both before and after, may be
regarded. Doubtless, the court gave proper instructions as
to the right and duty of the jury to look to prior or subse-
quent time for the purpose of obtaining such light as might
be reflected therefrom, under the evidence. The record is
simply silent as to what was charged on that subject.

4. The court charged the jury " that if they should find
from the evidence that John C. Davitte, at the time he made
the will, was of sound mind, and acted freely and volunta-
rily in doing so, then, any inequality which the will might
make among his children would be immaterial, because a
person has a right by will to give one child more than an-
other. But if the jury should find that, at the time of mak_
ing the will, the testator was imbecile from age, or his mind
weakened by the use of opiates, or that he was under the
influence or fear of another, or any fraudulent practice of
another, then, the jury might consider the inequality, if
any, made by the will among testator's children, for the
purpose of determining the condition of the mind of the

testator at the time of making the will, and whether or not he acted freely in doing so, or acted under any undue influence or fraud practiced on him." The objection to this charge is, that it seems to require undue influence, etc., to be found from other evidence, before the inequality of the will in its dispositions among the testator's children could be considered for any purpose. Taking the language literally, it would appear, at first view, to bear such a construction. So construed, the charge would be inaccurate; for the inequality might be, and generally ought to be, a factor in deciding upon the existence of undue influence, etc., and not alone upon whether the testator acted under it in making the will. The jury should not ask themselves whether, without the inequality, there is evidence enough to establish undue influence, etc., but whether there is enough with it. From a close scrutiny of the charge, it will be seen, however, that the court did not, in fact, cut off the jury from considering *all* the evidence (including the alleged inequality) in arriving at the existence or non-existence of undue influence, etc. In the first sentence the jury are told that if they should find *from the evidence* so and so; and in the second they are told that if they should find so and so. In the latter, it was not thought necessary to repeat "from the evidence;" but *that*, in all probability, was the meaning. And "the evidence" includes all the evidence. There is no express restriction of the jury to less than the whole. They are left free to consider every fact before them in making out the existence of undue influence, etc., and perhaps other parts of the charge not brought up may have been specific on that subject. The apparent incorrectness of the part before us is not due to what is in it, but to what is not in it; consequently, unless we knew that the court charged nothing more than is here, we cannot pronounce what is here erroneous. Because the court rightfully told the jury that they might consider the inequality of the will for one purpose, we cannot assume that he meant to tell them, or did tell them, that they could not consider it, to-

gether with the balance of the testimony, for other pur-
poses. The propositions of the charge are, in themselves,
true and correct. It is only by getting them tangled with
implications which may have been fully cleared up by the
court in other and further instructions, that they admit of
question. Let them be read over again in the light of these
observations, and they will be seen to be unobjectionable.

5. The court charged the jury, "that it was not an un-
natural will which gives one or more children more than
others of the children got, but only where the principal
portion of the estate is disposed of to strangers, to the ex-
clusion of the wife and children, and the rule that such un-
natural wills should be closely scrutinized, and upon the
slightest evidence of aberration of intellect, or collusion, or
fraud, or any undue influence or unfair dealing, probate
should be refused, is not applicable." We think this para-
graph of the charge should have been omitted. In a civil
case, where the jury are sworn to take the law from the
court, there would seem to be no occasion to mention a
rule which does not apply to the facts. To bring in a rule,
just to charge it out, has the appearance of being super-
fluous. We suspect, however, that the explanation of the
matter may be, that counsel had insisted on the application
of the principle laid down in the concluding part of sec-
tion 2399 of the Code, and that this part of the charge was
a reply from the bench to that position. As the will under
consideration gave no bounty to any stranger, but confined
all its dispositions to members of the testator's family, there
was, indeed, no applicability of the principle referred to.
We suppose that the court had no purpose to instruct the
jury as to what would or would not be an unnatural will
in the abstract, but only with reference to the rule of law
which he cites. So interpreting his language, he is correct;
but we are not without some apprehension that the jury
may have understood him to rule, generally, that the un-
naturalness of a will is a question of law, and that unequal
wills, where the inequality is among the testator's children,

are never, on that account, unnatural. In our opinion, what discriminations, if any, among his children, a testator could make by his will, without violating the ordinary dictates of nature, is a question of pure fact for the jury, under all the circumstances of the given case. We do not see how a court can know, judicially, that the limits of the family and of nature are co-terminous, and that a man never breaks through nature until he leaps over the family wall. We are inclined to think that the court did not intend, in this case, to do more than guard the jury against a misapplication of section 2399 of the Code; and though the jury may have misunderstood his object, or not discerned its precise scope, there is doubt enough on the subject to warrant us in abstaining from disturbing a verdict with which we are satisfied.

6. The court refused to charge, at the written request of the caveators, " that where the testator is aged, and infirm in body and mind, and his will is impeached on account of the undue influence of his son, a principal legatee, in its procurement, he ought to produce clear and satisfactory proof of the *bona fides* of his conduct in the matter." This request varies but little from a transcript of the head-note in *Simpler vs. Lord*, 28 *Ga.*, 52. But in that case, the degree to which the impeaching evidence had gone, was much in excess of that to which the evidence goes in the present case. Besides, it is not every head-note that is fit to be given to the jury as a guide in cases that are alike. Even a judge cannot always gather the true law of a case from mere notes. He has to read all the facts, and very frequently, most of the opinion. When a charge, dictated by counsel, is based on a head-note with such a vague word in it as "impeached," the dictation should be attended with some explanation of the sense in which the word is employed—whether in the sense of attacked, or, rendered doubtful, or, apparently overthrown.

7. The court refused to charge at the like request, " that if a party has it in his power to deny or rebut evidence

which tends to disprove his case, and does not do so, the presumption is that such evidence is true"—"the propounder, Jacob S. Davitte, being in court and attending the trial, but not testifying in the case." We approve the denial of this request, for two reasons: The first is, that so precise and definite a presumption as that pointed out, namely, that the unanswered evidence is true, is not drawn by the law itself, nor enjoined upon the jury; and the second is, that the request was based on the assumption, that because the propounder was present and competent to testify, he was bound to do so, or else suffer by his failure to offer himself as a witness in his own case. We think, on the contrary, that it is becoming, and to be commended, in a party not to testify, if he can avoid it without positive injury to the cause of truth and justice. As long as he is unheard, there should be no presumption that his silence is counseled by prudence rather than by modesty. While his case, should not gain by his forbearance to testify, neither should it lose by it. Public policy forbids that a suitor should feel constrained to mount the witness-stand for no purpose but to let the jury know that he has something to say in his favor, or to show them that he can face the terrors of a cross-examination without breaking down. The encouragement of anything like competition in swearing, would be too sure to breed perjury. Let those testify in their own behalf who voluntarily present themselves; but let no uncharitable imaginations light upon those who stay away, merely because they might swear if they would.

8. The court refused to charge at the like request: "That as no attempt was made to prove that the name of John C. Davitte was signed to the will by any other person by his direction, the burden is upon the propounders to show that the signature of J. C. Davitte to the will is his genuine signature, and unless this is proven to the satisfaction of the jury, the will cannot be established, and the jury should find against the will." The court charged, on the contrary: "That it was sufficient if the testator acknowledged the will

to be his in presence of the subscribing witnesses, and whether he so acknowledged it is a question for the jury under the evidence." There is no question that the testator's name was to the will when he called on the subscribing witnesses to attest the instrument as his will. Suppose it should be uncertain, and forever remain so, whether the signature was made by the testator or whether he adopted and ratified it as made for him by some other person. He could write and read writing. Some of the will, if not the whole of it, was in his own hand. He said the will was his, and requested the witnesses to attest it as such, and they did so. If he had acknowledged an unsigned will there would have been no acknowledgment of the signature; but he acknowledged a signed will, and that being so, he acknowledged the whole will as it was, the signature included. Reading sections 2414 and 2418 of the Code together, we think this was sufficient. The execution of a will is a business transaction, and the substance and sense of what is done must not be lost sight of. The law does not dictate any form of words to be used by testators, but leaves them to communicate with the witnesses in their own way. From the evidence, it is impossible for a rational mind to doubt, that the testator dealt with the paper as his will, and intended to complete the execution by having the witnesses to attest it at the time they subscribed at his request.

9. The court, after the testimony of the three subscribing witnesses had been read, admitted the will in evidence, over objection of the *caveators*, their objection being that neither legal execution nor attestation had been shown. That there was a *prima facie* case for the propounders, we have no doubt; nor do we think that the instrument, in such a proceeding as this, could have been excluded if the case had been doubtful.

10. The court charged the jury: "That a witness may attest a will by his mark, provided he can swear to the same, and it was for the jury to ascertain from the evidence whether or not the witness, James Rogers, had sworn to his mark

which he purports to have made as witness to said will; . . . that the mark made by a witness in attesting a will need not have any peculiarity about it, but any mark is sufficient if the witness, when called to testify, can swear to the mark." The Code (section 2415) pronounces a mark sufficient, on the sole condition that the witness shall be able to swear to it.    This is all the heraldry of the matter.    Nothing like a system of crests or bearings is contemplated; not even any special hook or claw on which the mind can hang recognition. As best it can, the memory may lay hold, and hold on, and the conscience swear to it.    A court cannot declare any peculiarity necessary, where the witness needs none.    It is not improbable that those who make marks for default of skill in making letters, have an aptitude of their own in distinguishing marks that to ordinary eyes look alike.    The faculty may be something like that of supplying an absent sense, by novel and ingenious applications of one or more of the remaining senses.

11. The court refused to charge, at the request of the caveators, "that if the jury believe, from the evidence, that John C. Davitte made this will against his will, or did not act freely and voluntarily in making this will, then they should find against the will."    Unless a request is all legal and pertinent, the court may well refuse it.    A charge in the terms of this request would have misled the jury, or might have done so, for there was evidence that the testator said, shortly after the will was executed, that he had made a will against his will.    His meaning probably was, not that he had acted contrary to his own free choice and volition, but contrary to strong desire.    Using the word will in the sense of desire, a man may make a valid testament against his will.    He might heartily wish that every provision in it could be altered consistently with his sense of duty, and, yet, it might be, legally and morally, as much and, as exclusively his own testamentary act as if he had no desire not in complete accord with it.    Will, in the sense of choice or consent, not in the sense of desire, is the will that

is requisite to testamentary freedom. If a man is free to choose, and free to give effect to his choice, he is the master of his own testament, and may yield to his desires, or oppose them, at his own election. Very much of judicious, virtuous living is carried on by painful sacrifices of inclination to duty—of the will of the affections to the will of the reason and conscience. Without first eliminating all ambiguity from the term, there is no truth in the proposition that a man cannot make a will against his will.

12. " The court, over objection by the caveators, admitted ·in evidence the statement of the witness, James Rogers, in answer to the first direct interrogatory, as follows : ' Thinks the annexed will is the same instrument he signed,' the will being annexed.' " The court, over like objection, " admitted in evidence the statement of the same witness, to the second direct interrogatory, ' that he thinks it the same will he witnessed for John C. Davitte.' " The objection urged to the evidence was, that the witness gave a bare opinion. The subject of the examination was the identity of the instrument. Identity is a matter of opinion, 10 *Ga.*, 513 ; 17 *Ib.*, 134. It was not objected that the witness did not state the facts on which his opinion was based. If it had been, we are not sure that a subscribing witness would be silenced on a question of identity until his reasons were forthcoming. We think no such rule has been usual in practice, and no authority upon the exact point was read.

13. The court refused to rule out, on motion of the caveators, a part of the answer of the witness, James Rogers, to the fourth cross-interrogatory : " Thinks he made the mark on the will—of course, cannot say positively." In addition to the objection that this was bare opinion, it was objected, further, that the statement was not pertinent to the question, the latter being as follows : " After five or six years, can you tell one cross-mark from another ? If so, how do you tell ? " The whole answer thereto was as follows : " That he cannot tell after so long awhile one mark from another ; thinks he made the mark on the will—of

course, cannot say positively." The witness meant to state his belief as to the mark. See next head above, and 12 *Ga.*, 257. He testifies like a cautious, conscientious person, and, on that account, his evidence is perhaps more valuable than if he had expressed himself more decidedly. We think the answer not so much beyond the question as to render any of it inadmissible. These things cannot be cast together so as to make an exact, mechanical fit. It is hardly practicable to deal with testimony as we would with bullets—cutting off the necks, and rejecting the superabundant material which has run over in moulding.

14. The caveators, in interrogatories sued out by themselves for Martin, one of the subscribing witnesses to the will, propounded this question : " From what you saw, from the facts known to yourself, from the conversation you heard between Jacob S. Davitte and John C. Davitte, and the conduct of the parties, what do you say about the said will being freely and voluntarily made ? Answer this question fully, to the best of your knowledge and belief." The witness answered thus : " From the best of my knowledge and belief, John C. Davitte did not make said will freely and voluntarily." This answer was excluded by the court. We have seen no authority to the effect that a subscribing witness may give his opinion, without any fact, as to the testator's freedom or want of freedom in executing the will. So far as that question is included in the question of sanity or insanity, of course he may do so. But, beyond that, the two questions are somewhat unlike. To establish the absence of free agency in a sane man, you must find a cause for its absence. That cause is always some matter of fact. Why, then, should not a subscribing witness speak directly to the fact, and not as to his mere opinion concerning it, or concerning its effects. To believe a man insane, you need know nothing of the external conditions to which he has been exposed; but to believe him morally enslaved, you must know something of his master, or some manifestation of control. The question propounded to the witness appealed

to facts, but they were, in part, facts known only to the witness, and not disclosed in any of his testimony.   Moreover, in answering the question, the witness states neither what his knowledge is, nor what his belief is, nor does he state that he has any knowledge or belief.   He answers "from the best of his knowledge and belief."   See 23 *Ga.*, 480.   On the whole, we think the better ruling was that which the court made.   The answer was properly excluded.

15. The verdict, we think, was what it should have been, and ought again to be, under the evidence, if another trial were had.   For this reason, though the charge of the court, as we have seen, is not wholly free from error, we cannot feel warranted in overruling the court in refusing a new trial.   A correct verdict is far more important than a correct charge.

Cited against the will, 52 *Ga.*, 169 ; 26 Gratt., 152 ; 52 Ala., 430 ; 6 *Ga.*, 334, 359, 360 ; 11 *Ib.*, 343 ; 32 *Ib.*, 325 ; Code, § 2401 ; 52 *Ga.*, 170, 182 ; 27 *Ib.*, 628, 629 ; Code, § 2408 ; 28 *Ga.*, 52 ; Stark. on Ev., 76, 762 ; Acts of 1851–2, p. 106 ; Code, §§ 2414, 2418, 2424 ; 2 Gr'l'fs, Ev., §676 ; 40 *Ga.*, 122 to 126 ; 37 Vt., 218 ; 1 Wms Ext'rs, 112 to 118 ; 1 Denio, 33 ; 10 Paige, 85, 91 ; 2 Eng. Law and Eq., 594 ; Code, § 2415 ; 40 *Ga.*, 122, 126 ; 51 *Ib.*, 24 ; 18 *Ib.*, 524 ; 1 Wharton's Ev., §510 ; Code, § 3867 ; Stark. Ev., 215.

Cited for the will, 1 Red. on Wills, 31, 32, 218, 219, 229, 242, 524, 534, 544 ; 2 Gr'ls'f's Ev., §§ 688, 689 ; 41 *Ga.*, 696 ; 6 *Ib.*, 324 ; 21 *Ib.*, 522 ; 30 *Ib.*, 808 ; 17 Pick., 373, 379 ; 3 Leigh, 436, 442, 443 ; 18 *Ga*, 396 ; Code, § 2415 ; 2 Brad. Sur., 385 ; 1 Harring., 57 ; 18 *Ga.*, 40.

Judgment affirmed.